**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

NATIONAL ELECTRICAL
MANUFACTURERS ASSOCIATION,

*Petitioner,*

v.

UNITED STATES DEPARTMENT OF
ENERGY; UNITED STATES OF
AMERICA,

*Respondents.*

No. 10-1533

NATURAL RESOURCES DEFENSE
COUNCIL,

*Amicus Supporting Respondents.*

On Petition for Review of an Order of
the Department of Energy.
(EERE-2007-BT-STD-0007)

Argued: May 12, 2011

Decided: August 16, 2011

Before KING, SHEDD, and WYNN, Circuit Judges.

Petition for review denied by published opinion. Judge King wrote the majority opinion, in which Judge Wynn joined. Judge Shedd wrote a dissenting opinion.

## COUNSEL

**ARGUED:** John Andrews Hodges, WILEY REIN, LLP, Washington, D.C., for Petitioner. H. Thomas Byron, III, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondents. **ON BRIEF**: Clark R. Silcox, NATIONAL ELECTRICAL MANUFACTURERS ASSOCIATION, Rosslyn, Virginia; Eric Andreas, WILEY REIN, LLP, Washington, D.C., for Petitioner. Scott Blake Harris, General Counsel, Daniel Cohen, Assistant General Counsel, Michael Kido, Bettina Mumme, UNITED STATES DEPARTMENT OF ENERGY, Washington, D.C.; Tony West, Assistant Attorney General, Michael S. Raab, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondents. Timothy D. Ballo, EARTHJUSTICE, Washington, D.C.; Katherine Kennedy, Christine Chang, NATURAL RESOURCES DEFENSE COUNCIL, New York, New York, for Amicus Supporting Respondents.

---

## OPINION

KING, Circuit Judge:

The National Electrical Manufacturers Association ("NEMA") petitions for review of a final rule promulgated by the United States Department of Energy (the "DOE") setting forth energy conservation standards for electric induction motors ranging in power output from .25 to 3 horsepower. *See* Energy Conservation Standards for Small Electric Motors: Final Rule, 75 Fed. Reg. 10874 (Mar. 9, 2010) (codified at 10 C.F.R. pt. 431) (the "Final Rule"). In promulgating the Final Rule, the DOE invoked its authority to establish energy conservation standards for "small electric motor[s]," a term defined by the Energy Policy and Conservation Act (the "EPCA"). *See* 42 U.S.C. § 6311(13)(G). NEMA contends that the relevant statutory definition unambiguously excludes all

such motors exceeding 1 horsepower, as well as certain motors rated at and less than 1 horsepower, from being regulated as small electric motors. As explained below, because the Final Rule embodies a permissible interpretation of the statutory definition, we deny the petition for review.

I.

A "small electric motor" is a type of electric induction motor, which is a machine that converts electricity into rotational mechanical power. The more efficient electric induction motors create more mechanical power using less electricity. The Final Rule is the DOE's response to the EPCA's directive that the DOE promulgate energy conservation (or efficiency) standards to govern certain small electric motors. The motors covered by the Final Rule are manufactured in two-, four-, and six-pole configurations and range from .25 to 3 horsepower.[1] The covered motors have a wide variety of industrial and commercial applications, the largest of which are used in pumping and in heating, ventilating, and air-conditioning ("HVAC") systems. The DOE estimates that the standards pronounced in the Final Rule "will save approximately 2.2 quads . . . of energy over 30 years," which "is equivalent to about 2.2 [percent] of total annual U.S. energy consumption" and will "eliminate the need for approximately eight new 250-megawatt . . . power plants" as well as "result in cumulative greenhouse gas emission reductions of . . . an amount equal to that produced by approximately 25 million new cars in a year." Final Rule, 75 Fed. Reg. 10874, 10876 (Mar. 9, 2010) (codified at 10 C.F.R. pt. 431).

NEMA's petition for review challenges whether certain of the electric induction motors covered by the Final Rule fall

---

[1]"Pole configuration" refers to the number of magnetic poles in an electric induction motor. The number of poles is directly related to the theoretical maximum rotational speed at which a motor can operate, as measured in revolutions per minute (rpm).

within the statutory definition of the term "small electric motor." Resolving this challenge requires us to examine a highly technical regulatory framework that governs a complex market and is characterized by fine technological distinctions. Accordingly, we begin by sketching the regulatory architecture of which the definition is a part, as well as the relevant provisions of NEMA Standards Publication MG1-1987, the industry publication to which the definition refers. We then describe the process culminating in the promulgation of the Final Rule and NEMA's challenge thereto.

## A.

The story underlying this litigation begins with the enactment of the Energy Policy Act of 1992, Pub. L. No. 102-486, 106 Stat. 2776 (the "Energy Policy Act"). The Energy Policy Act amended the EPCA, directing the DOE to promulgate energy conservation standards for various products and equipment. Among other things, the EPCA requires the DOE to "prescribe, by rule, energy conservation standards for those small electric motors for which" the DOE determines that such standards are "technologically feasible and economically justified, and would result in significant energy savings." 42 U.S.C. § 6317(b)(1)-(2).[2] Such standards must satisfy the criteria specified in 42 U.S.C. § 6295(o). *See id.* § 6316(a).[3]

---

[2]The energy conservation standards promulgated under the EPCA do not apply to "any small electric motor which is a component of" certain other covered products and equipment, such as residential air conditioners and heat pumps, clothes washers and dryers, and commercial-packaged air conditioning and heating equipment. 42 U.S.C. § 6317(b)(3).

[3]Under the EPCA, any new or amended standard for small electric motors must "be designed to achieve the maximum improvement in energy efficiency . . . which the [DOE] determines is technologically feasible and economically justified." 42 U.S.C. § 6295(o)(2)(A). The DOE may not promulgate a standard that "is not technologically feasible or economically justified," or that would not result in the "significant conservation of energy." *Id.* § 6295(o)(3)(B). The DOE is obliged to weigh several benefits and costs to determine whether a standard is economically justified. *See id.* § 6295(o)(2)(B).

The resolution of this challenge turns on the meaning of the term "small electric motor," which, as provided by the EPCA, "means a NEMA general purpose alternating current single-speed induction motor, built in a two-digit frame number series in accordance with NEMA Standards Publication MG1-1987." 42 U.S.C. § 6311(13)(G). MG1-1987 is an industry publication that sets forth specifications for electric motors and generators, which collectively are called "machines." The publication classifies machines in various ways, such as by size, application, electrical type, and variability of speed. *See* J.A. 13-22.[4] Two of those classifications are relevant here: size and application.

With respect to classification by size, a machine may be a "Small (Fractional) Machine," a "Medium (Integral) Machine," or a "Large Machine." J.A. 13-14. Paragraph 1.02 of MG1-1987 provides that a motor is a "small machine" if it "is *either* (1) a machine built in a two-digit frame number series in accordance with [¶] 11.01.1 *or* (2) a machine built in a frame smaller than that frame of a medium machine . . . which has a continuous, open-construction rating at 1700-1800 rpm of 1 horsepower." *Id.* at 13 (emphases added).[5] By contrast, under ¶ 1.03.1, "[a]n alternating-current medium machine is a machine (1) built in a three- or four-digit frame number series in accordance with [¶] 11.01.2 . . . *and* (2) having a continuous, open-construction rating up to and including" 500 horsepower. *Id.* at 13-14 (emphasis added).

MG1-1987 also classifies machines by application. Rele-

---

[4] Citations herein to "J.A. __" refer to the contents of the Joint Appendix filed by the parties in this appeal.

[5] Subparagraph 11.01.1 of MG1-1987 governs the numbering of frames for small machines, and predicates such numbering on physical size. That subparagraph provides that "[t]he frame number for small machines shall be the D dimension in inches multiplied by 16," J.A. 52, where the D dimension is the distance from the "[c]enterline of shaft to bottom of feet" of the motor frame, *id.* at 31.

vant here is ¶ 1.05, which defines the term "general-purpose alternating-current motor" as

> an induction motor, rated 200 horsepower and less, which incorporates all of the following:
>
> > 1. Open construction.
> >
> > 2. Rated continuous duty.
> >
> > 3. Service factor in accordance with MG1-12.47.
> >
> > 4. Class A insulation system with a temperature rise as specified in MG1-12.42 for small motors or Class B insulation system with a temperature rise as specified in MG1-12.43 for medium motors.
>
> It is designed in standard ratings with standard operating characteristics and mechanical construction for use under usual service conditions without restriction to a particular application or type of application.

J.A. 14. Paragraph 1.05 of MG1-1987 thus limits general purpose motors to a maximum of 200 horsepower and requires that they be built in an open (rather than enclosed) construction.[6] A subsequent version of MG1 expanded ¶ 1.05 to provide that such motors may also be built in an enclosed construction. Paragraphs 12.42 and 12.43, referenced in ¶ 1.05, make no mention of horsepower rating.

---

[6]"Open" or "enclosed" construction, as used in ¶ 1.05, refers to the type of housing utilized in an electric induction motor. An open housing allows outside air to pass through and cool the motor during operation, while an enclosed housing does not circulate outside air.

Two other aspects of the definition in ¶ 1.05 are important for our inquiry. First, it references ¶ 12.47, which sets forth, in Table 12-2, the service factor specifications for small and medium general-purpose alternating-current electric induction motors. *See* J.A. 72.[7] Table 12-2, in turn, delineates small and medium motors at certain horsepower ratings. Specifically, for two-pole motors operating at 3600 rpm, 1 horsepower motors are "small" while 1.5 horsepower motors are "medium." For four-pole motors operating at 1800 rpm, a .75 horsepower motor is small while a 1 horsepower motor is medium; for six-pole motors operating at 1200 rpm, a .5 horsepower motor is small while a .75 horsepower motor is medium. Second, ¶ 1.05 requires a general purpose motor to be designed in "standard ratings with standard operating characteristics," which means that such motors must meet prescribed performance characteristics, one example of which is locked rotor torque as specified in ¶ 12.32. Subparagraphs 12.32.2 and .3 reflect the same delineations between small and medium motors as found in Table 12-2.[8]

### B.

In 2006, the DOE took the first step toward establishing energy conservation standards for small electric motors when it determined that such standards appeared to be technologically feasible and economically justified, and would result in significant energy savings. *See* Determination Concerning the Potential for Energy Conservation Standards for Small Electric Motors, 71 Fed. Reg. 38799 (published July 10, 2006) (the "Determination"). In the Determination, the DOE identi-

---

[7]The "service factor" of an electric induction motor "is a measure of the overload capacity at which a motor can operate without thermal damage, while operating normally within the correct voltage tolerances." Final Rule, 75 Fed. Reg. at 10885.

[8]Other performance characteristics are also specified in Parts 10 and 12 of MG1-1987, and those provisions do not specify ratings for small motors exceeding 1 horsepower. *See* J.A. at 45-46, 64-72.

fied one "key issue" as "the definition of a 'small electric motor' and precisely which motors are covered by this rule-making." *Id.* at 38800. The DOE consulted MG1-1987 to address this question, observing that "the two-digit frame series" specified in the statutory definition "encompasses NEMA frame sizes 42, 48, and 56, and motors with horse-power ratings ranging from [.25] to 3 horsepower." *Id.*

In the Determination, the DOE also recognized that the statutory definition requires small electric motors to be "NEMA general purpose . . . motor[s]," prompting the DOE to state that "[t]he EPCA definition of a small motor is tied to the NEMA Standards Publication MG1-1987 performance requirements that NEMA has established for general purpose motors, such as the minimum levels for breakdown and locked rotor torque for small electric motors presented in MG1-1987 paragraph 12.32." Determination, 71 Fed. Reg. at 38800. In light of those requirements, the DOE found "that of the motors that satisfy the frame-size requirements of the small-motors definition, only a subset satisfies the other per-formance requirements of the definition." *Id.* at 38800-01.

In 2007, the DOE released a document announcing the scope of coverage for its rulemaking concerning this matter. This document identified relevant portions of MG1-1987, including ¶ 1.05. In particular, the document addressed the horsepower ratings of electric induction motors subject to the rulemaking. It observed first that "[t]he MG-1 standards dis-cussed in the [section of the document dealing with horse-power ratings] are not explicitly referenced by the definitions of" the other terms in MG1-1987. J.A. 82. The DOE then remarked that, "[a]s seen in [Tables 10-1 and 10-2], MG1-1987 identifies small induction motors as motors with horse-power ratings from 1 millihorsepower up to 1 horsepower." *Id.*

In 2009, after public input and the DOE's further study, DOE issued a Notice of Proposed Rulemaking. *See* Energy

Conservation Standards for Small Electric Motors: Proposed Rule, 74 Fed. Reg. 61410 (proposed Nov. 24, 2009) (the "Notice"). The Notice addressed the import of MG1-1987 regarding two aspects of the electric induction motors subject to the rulemaking relevant here: horsepower rating and open or enclosed construction. As to horsepower ratings, the Notice observed first that the statutory definition "does not explicitly limit the scope of coverage to certain horsepower ratings." *Id.* at 61422. The Notice stated further that "the small electric motor industry generally considers 3 hp as the upper limit for rated capacity of such motors." *Id.*

The Notice also addressed the comments of Earthjustice, an environmental advocacy group, regarding the regulation of electric induction motors built in an enclosed construction. Earthjustice contended that DOE could regulate such motors, even though ¶ 1.05 of MG1-1987 requires a general purpose motor to be built in an open construction. Earthjustice based its view on subsequent versions of MG1 having expanded the definition of "general-purpose . . . motor" to include motors built in both open and enclosed constructions. Earthjustice's view took as one premise that the statutory definition's reference to MG1-1987 applied only to the frame size requirement found in the definition's second clause, and not to the term "NEMA general purpose . . . motor" in the definition's first clause. *See* Notice, 74 Fed. Reg. at 61421. According to Earthjustice, therefore, nothing prevented DOE from treating enclosed motors as "NEMA general purpose . . . motor[s]." NEMA disagreed with Earthjustice, and the DOE declared that it "agrees with NEMA that the reference MG1-1987 applies to all facets of the statutory definition of a small electric motor." *Id.*

The period of time following issuance of the Notice involved a comment period and an additional public meeting. At the public meeting and in written comment, NEMA objected on the ground that some of the electric induction motors identified in the Notice exceeded what NEMA

asserted were MG1-1987's horsepower limitations for small motors, and therefore fell outside the statutory definition. Earthjustice also reiterated its view that enclosed motors could be regulated in the rulemaking because the reference to MG1-1987 does not unambiguously apply to the first clause of the statutory definition. Other commenters echoed Earthjustice's position, urging the DOE to announce a broader rule. *See, e.g.*, J.A. 351-52, 355, 359-60.

On March 9, 2010, the DOE promulgated the Final Rule. The Final Rule set forth energy conservation standards for certain electric induction motors ranging in power from .25 to 3 horsepower:

> (a) Each small electric motor manufactured . . . after March 9, 2015, shall have an average full load efficiency of not less than the following:

| Motor horsepower / standard kilowatt equivalent | Average full load efficiency | | |
|---|---|---|---|
| | Polyphase | | |
| | Open motors (number of poles) | | |
| | 6 | 4 | 2 |
| 0.25 / 0.18 | 67.5 | 69.5 | 65.6 |
| 0.33 / 0.25 | 71.4 | 73.4 | 69.5 |
| 0.5 / 0.37 | 75.3 | 78.2 | 73.4 |
| 0.75 / 0.55 | 81.7 | 81.1 | 76.8 |
| 1 / 0.75 | 82.5 | 83.5 | 77.0 |
| 1.5 / 1.1 | 83.8 | 86.5 | 84.0 |
| 2 / 1.5 | N/A | 86.5 | 85.5 |
| 3 / 2.2 | N/A | 86.9 | 85.5 |

| Motor horsepower / standard kilowatt equivalent | Average full load efficiency | | |
| --- | --- | --- | --- |
| | Capacity-start capacitor-run and capacitor-start induction-run | | |
| | Open motors (number of poles) | | |
| | 6 | 4 | 2 |
| 0.25 / 0.18 | 62.2 | 68.5 | 66.6 |
| 0.33 / 0.25 | 66.6 | 72.4 | 70.5 |
| 0.5 / 0.37 | 76.2 | 76.2 | 72.4 |
| 0.75 / 0.55 | 80.2 | 81.8 | 76.2 |
| 1 / 0.75 | 81.1 | 82.6 | 80.4 |
| 1.5 / 1.1 | N/A | 83.8 | 81.5 |
| 2 / 1.5 | N/A | 84.5 | 82.9 |
| 3 / 2.2 | N/A | N/A | 84.1 |

10 C.F.R. § 431.446.

The preamble to the Final Rule responded to NEMA's objections that some of the motors are too powerful to be regulated as small electric motors. Specifically, it stated:

DOE understands that NEMA MG1-1987 does not provide ratings for small motors of the identified higher horsepower ratings. However, DOE does not believe this precludes certain higher horsepower ratings built in a two-digit NEMA frame consistent with NEMA MG1-1987 from coverage. In addition, upon review of NEMA manufacturer catalogs, DOE noted that two-digit frame size motors of higher horsepower ratings are commonly marketed as general purpose. DOE also observed from NEMA shipment data provided to DOE for the determination analysis that when NEMA surveyed its members and requested shipments of general purpose motors built in a two-digit frame number series, responding manufacturers provided shipments data in horsepower

ratings exceeding those listed in [NEMA's] comments above. Although NEMA argued that these motors do not fall within this rulemaking, NEMA did not deny that these motors are considered general purpose motors. Thus, DOE believes that even though NEMA MG1-1987 does not provide standard ratings for higher horsepower small electric motors, many of these motors are considered NEMA general purpose motors that could be considered for coverage by DOE.

Final Rule, 75 Fed. Reg. at 10883.

As recognized in the Final Rule's preamble, the DOE determined which electric induction motors were within the statutory definition by consulting materials from motor manufacturers, including catalog entries that advertise "general purpose" motors built in a two-digit frame series with power outputs up to 3 horsepower. J.A. 420-30. The preamble explained further that the Final Rule "does not codify a definition for 'NEMA general purpose motor,'" although the "DOE will consider proposing a definition for this term" in a future rulemaking. Final Rule, 75 Fed. Reg. at 10886. The DOE also reiterated that MG1-1987 informs the meaning of the term "NEMA general purpose . . . motor" in the statutory definition, such that motors within the definition must satisfy MG1-1987's performance requirements. *See* J.A. 533-34.

The preamble also addressed the remarks of Earthjustice, which contended that the DOE could regulate electric induction motors with both open and enclosed construction by interpreting "the phrase MG1-1987" in the statutory definition of "small electric motor" to apply "only to the two digit frame number series requirement" in the definition's second clause. Final Rule, 75 Fed. Reg. at 10882. DOE responded by reiterating its "belie[f] that its scope of coverage in this final rule is appropriate," *id.*, explaining that MG1-1987 applies to "all facets" of the definition, J.A. 537.

### C.

NEMA pursued its challenge to the Final Rule by filing this petition for review. NEMA contends that the statutory definition of a small electric motor unambiguously excludes all electric induction motors exceeding 1 horsepower, as well as certain motors rated at and less than 1 horsepower. Specifically, NEMA's objections track the delineations between small and medium motors set forth in Parts 10 and 12 of MG1-1987. *See supra* at 7 & note 8. Thus, NEMA maintains that six-pole motors are not within the definition if they exceed .5 horsepower; that four-pole motors are not if they exceed .75 horsepower; and that two-pole motors are not if they exceed 1 horsepower. NEMA further asserts that, because these more-powerful motors fall outside the definition, we must vacate the Final Rule in its entirety, as those motors were included in the calculations supporting DOE's determination that the Final Rule was warranted.

### II.

The EPCA provides that "[a]ny person who will be adversely affected by a rule prescribed under [42 U.S.C. § 6295] may . . . file a petition with the United States court of appeals for the circuit in which such person resides or has his principal place of business, for judicial review of such rule." 42 U.S.C. § 6306(b)(1).[9] We possess "jurisdiction to review the rule in accordance with [5 U.S.C. §§ 701-706], and to grant appropriate relief as provided in" those provisions. *Id.* § 6306(b)(2). We are thus tasked with "decid[ing] all relevant questions of law" and "interpret[ing] . . . statutory provisions" at issue. 5 U.S.C. § 706. We are bound to "hold unlawful and set aside" the Final Rule if we determine that it is "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . (C) in excess of statutory jurisdic-

---

[9]NEMA's principal place of business is located in this Circuit, that is, in Rosslyn, Virginia.

tion, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law." *Id.* § 706(2).

### III.

The sole issue before us in this proceeding is whether DOE's interpretation of "small electric motor" is within the range of permissible interpretations thereof. NEMA argues that Parts 10 and 12 of MG1-1987 restrict the horsepower of small electric induction motors, and that the statutory definition unambiguously incorporates this limitation.[10]

In its papers before this Court, the DOE agrees with NEMA that MG1-1987 applies to both clauses of the statutory definition, but does not agree that such an upper horsepower limitation is so incorporated. The DOE contends that the definition's second clause, which expressly refers to MG1-1987, requires merely that a small electric motor is one built in an appropriate frame series. The DOE has interpreted the term "NEMA general purpose . . . motor" in the definition's first clause to incorporate the requirements of MG1-1987 ¶ 1.05. Paragraph 1.05, in turn, specifies (among other things) that a general purpose motor must possess "standard ratings" and "standard operating characteristics" found in Parts 10 and 12 of MG1-1987. The DOE points out, however, that the definition does not unambiguously incorporate the delineations between "small" and "medium" motors found in Parts 10 and

---

[10]The DOE does not dispute, and we agree, that if the more-powerful motors do not fall within the statutory definition, we must vacate the Final Rule in its entirety, and cannot simply strike down the standards for those motors and leave in place the standards for the motors that NEMA concedes fall within the definition. This is because DOE's finding that energy conservation standards are warranted is predicated on calculations including the more-powerful motors. Moreover, there is no doubt that DOE intended the Final Rule as "one, integral action," all the components of which "must stand or fall together." *North Carolina v. EPA*, 531 F.3d 896, 929 (D.C. Cir. 2008).

12, and has declined to interpret the definition in such a way. Rather, the DOE explains, a 3-horsepower motor built in a two-digit frame series is a "small electric motor" for purposes of the statutory definition, so long as it is general purpose and possesses standard ratings and operating characteristics enumerated in Parts 10 and 12 — even if those ratings and operating characteristics correspond with those of a "medium" motor.

To evaluate the parties' contentions, we must employ the familiar framework of *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). We will first describe the relevant precepts of the *Chevron* framework, and then apply those principles to DOE's interpretation of the statutory definition.

## A.

We have explained that "*Chevron* deference is a tool of statutory construction whereby courts are instructed to defer to the reasonable interpretations of expert agencies charged by Congress to fill any gap left, implicitly or explicitly, in the statutes they administer." *Am. Online, Inc. v. AT&T Corp.*, 243 F.3d 812, 817 (4th Cir. 2001) (internal quotations and emphasis omitted). Under *Chevron*, we first ask "whether Congress has directly spoken to the precise question at issue," and "[i]f the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." 467 U.S. at 842-43. If, however, "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843.

Under the first step of *Chevron*, a reviewing court is to "employ[ ] traditional tools of statutory construction" to determine whether Congress addressed "the precise question at issue." 467 U.S. at 842, 843 n.9. In this inquiry, we begin with

the text and structure of the statute. *See Cabell Huntington Hosp., Inc. v. Shalala*, 101 F.3d 984, 986 (4th Cir. 1996). At step one, we also bring to bear principles of grammatical usage. *See Barnhart v. Thomas*, 540 U.S. 20, 26 (2003). While we ordinarily wade into a statute's legislative history only after deeming the statute ambiguous, *see United States v. Hatcher*, 560 F.3d 222, 226 (4th Cir. 2009), we have described legislative history as one of the traditional tools of interpretation to be consulted at *Chevron*'s step one. *See, e.g.*, *Elm Grove Coal Co. v. Dir., O.W.C.P.*, 480 F.3d 278, 293-94 (4th Cir. 2007).

Importantly, though, in consulting legislative history at step one of *Chevron*, we have utilized such history only for limited purposes, and only after exhausting more reliable tools of construction. For example, in *Elm Grove Coal*, we consulted legislative history solely to bolster our conclusion that the agency's interpretation was permissible — a conclusion formed after a thorough examination of the statutory language at issue and the applicable canons of construction. *See* 480 F.3d at 293-96. NEMA has not identified, nor are we aware of, any decision in which we relied on legislative history, standing alone, to *reject* an agency's interpretation of a statute it administers. In this regard, we have consistently emphasized that "the plain language of the statute is . . . the most reliable indicator of [c]ongressional intent." *Soliman v. Gonzales*, 419 F.3d 276, 281-82 (4th Cir. 2005). Accordingly, federal courts are obliged to "avoid the pitfalls that plague too quick a turn to the more controversial realm of legislative history." *Lamie v. U.S. Tr.*, 540 U.S. 526, 536 (2004).

Where "Congress has [not] directly spoken to the precise question at issue," *Chevron*, 467 U.S. at 842, we "must . . . proceed to the second step of the *Chevron* analysis," *Capitol Mortg. Bankers, Inc. v. Cuomo*, 222 F.3d 151, 155 (4th Cir. 2000). In this respect, the Supreme Court has instructed that "[f]ew phrases in a complex scheme of regulation are so clear as to be beyond the need for interpretation when applied in a

real context." *Nat'l R.R. Passenger Corp. v. Boston & Maine Corp.*, 503 U.S. 407, 418 (1992). We have proceeded to *Chevron*'s second step where the statutory language "neither plainly compel[led] nor clearly preclude[d] [an] interpretation," because in such circumstances the "precise import" of the language "is ambiguous and certainly not free from doubt." *United Seniors Ass'n, Inc. v. Social Security Admin.*, 423 F.3d 397, 403 (4th Cir. 2005) (internal quotation marks omitted). Similarly, we have reached *Chevron*'s second step after describing statutory language as "susceptible to more precise definition and open to varying constructions." *Md. Dep't of Health & Mental Hygiene v. Centers for Medicare and Medicaid Servs.*, 542 F.3d 424, 434 (4th Cir. 2008) (internal quotation marks omitted).

If we determine that "the statute is ambiguous on the" precise question at issue, "we defer at [*Chevron*'s] step two to the agency's interpretation so long as the construction is a reasonable policy choice for the agency to make." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 986 (2005) (internal quotation marks omitted). We afford "controlling weight" to an agency's reasonable interpretation even where we would have, if writing on a clean slate, adopted a different interpretation. *Regions Hosp. v. Shalala*, 522 U.S. 448, 457 (1998). We have deferred to an agency's interpretation of an ambiguous statute where the interpretation "is grammatically correct and . . . accommodates the purpose of the [enactment]." *Gatlin Oil Co., Inc. v. United States*, 169 F.3d 207, 211 (4th Cir. 1999). The degree of deference afforded the agency "is particularly great where . . . the issues involve a high level of technical expertise in an area of rapidly changing technological and competitive circumstances." *Verizon Tel. Cos. v. FCC*, 292 F.3d 903, 909 (D.C. Cir. 2002) (internal quotation marks omitted).

### B.

We now turn to whether the statutory definition unambiguously forecloses the DOE's interpretation. We must, of

course, evaluate the permissibility of the DOE's interpretation by reference to the entirety of the definition, and not by reading any portion thereof in isolation. *See Elm Grove Coal*, 480 F.3d at 293 ("[W]e must not be guided by a single sentence or member of a sentence, but instead must look to the provisions of the whole law, and to its object and policy." (internal quotation marks omitted)). In this regard, we observe that the statutory definition consists of two clauses — the first referring to a "NEMA general purpose . . . motor" (a term not defined in either the statute or regulations), the second referring to the frame series in which a small electric motor must be built. 42 U.S.C. § 6311(13)(G).

For NEMA to prevail, the statutory definition must unambiguously incorporate the horsepower limitation that NEMA contends is found in MG1-1987. In light of the language and structure of the definition, as well as ordinary principles of grammar, we conclude that the definition does not unambiguously incorporate such a limitation. To begin with, we are not free to disregard Congress's decision to break the definition into two clauses. Second, the express reference to MG1-1987 in the definition's second clause does not unambiguously incorporate all of that publication's provisions, but rather only its specifications for frame size. Third, the term "NEMA general purpose . . . motor" in the definition's first clause likewise does not unambiguously impose NEMA's proposed horsepower limitation. Finally, the available legislative history does not justify NEMA's reading.

1.

We begin by examining the definition as a whole. In this regard, Congress's deliberate choice to break the statutory definition into two clauses is revealing. The definition first requires a small electric motor to be a "NEMA general purpose . . . motor," while the comma and following language impose the additional requirement that such a motor is one built in specified frame numbers. The addition of the second

clause therefore differentiates small electric motors from others on the basis of but one of MG1-1987's specifications — those provisions relating to frame size — and not its specifications relating to power output.

Importantly, Congress had at its disposal many straightforward ways, had it so wished, to incorporate the horsepower limitations that NEMA contends are found in MG1-1987 — none of which it adopted. *Cf. Hatcher*, 560 F.3d at 228 (refusing to substitute "clear language" of statute "with . . . unenacted legislative intent" where Congress "quite eas[ily]" could have "includ[ed] limiting language" but did not do so (internal quotation marks omitted)). Congress could have set forth an express horsepower range within which small electric motors must fall. Indeed, Congress took this very course elsewhere in the same enactment, establishing statutory energy conservation standards for electric motors built in a three-digit frame series ranging from 1 to 200 horsepower. *See* 42 U.S.C. § 6313(b)(1); J.A. 547.

In the alternative, Congress could have simply omitted the comma and reference to frame size from the statutory definition — much in the way that NEMA excerpts the definition in its papers to this Court. *See* Petr.'s Br. 25 ("Congress defined a small electric motor as a 'NEMA general-purpose [sic] alternating-current [sic] induction motor . . . built in accordance with NEMA Standards Publication MG1-1987.'") (omission in original; emphasis omitted); *see also id.* at 28 (same). Or, Congress could have opted for simpler language and structure adopting the delineations between small and medium motors found in MG1-1987 Parts 10 and 12, providing, say, that a small electric motor must comport with the ratings and operating characteristics specified for small motors in MG1-1987.

Suffice it to say, Congress imposed no express horsepower limitation; thought it important enough to add the comma and reference to frame size to the definition; and did not see fit to

adopt a simpler definition that incorporated MG1-1987's provisions wholesale. As to the absence of an express horsepower limitation, other provisions of the same enactment make clear that Congress knew how to impose such a limitation when it so desired. And as to the presence of the comma and reference to frame size, Congress went out of its way to identify but one specification enumerated in MG1-1987 (frame size) while avoiding any reference to the publication's other specifications. NEMA thus undermines its reading of the definition when it purports to quote the definition in its papers. NEMA's reading would, quite literally, excise the definition's specific reference to frame series and alter it to contain only a single clause. In so doing, NEMA runs headlong into the cardinal principle that "we have a duty, where possible, to give effect to all operative portions of the enacted language, including its every clause and word." *Shipbuilders Council of Am. v. U.S. Coast Guard*, 578 F.3d 234, 244-45 (4th Cir. 2009) (internal quotation marks omitted). NEMA's reading would simultaneously render superfluous the first clause's use of the term "NEMA": if the language "NEMA Standards Publication MG1-1987" in the second clause had the sweeping reach that NEMA gives it, there would be no need for the generic reference to "NEMA" in the first clause.

2.

Turning now to the express reference to MG1-1987 in the statutory definition's second clause, we conclude that its only unambiguous import is to require small electric motors to be built in an appropriate frame.[11] First, the language of the sec-

---

[11]Our dissenting colleague asserts that the DOE has, in essence, hoodwinked us into accepting a post hoc litigation position on the import of the second clause's express reference to MG1-1987. To the contrary, we explain in considerable detail *infra* at 31-35 why the DOE's arguments on review are consistent with its underlying rulemaking approach. Left without explanation, however, is the dissent's insistence that NEMA's interpretation of MG1-1987, adopted for the express purpose of challenging

ond clause is nearly identical to MG1-1987's definition of a small machine, and both distinguish small and medium motors based on frame series (and thus physical size) rather than power output. *Compare* 42 U.S.C. § 6311(13)(G) (requiring, inter alia, that small electric motors must be "built in a two-digit frame number series in accordance with . . . MG1-1987"), *with* J.A. 13 (MG1-1987 ¶ 1.02) (providing that one type of "small machine" is one "built in a two-digit frame number series in accordance with [¶] 11.01.1"). Subparagraph 11.01.1, in turn, is a clear reference to physical size. *See supra* at 5 & note 5. Paragraph 1.02 nowhere references the delineations between small and medium motors found in MG1-1987 Parts 10 and 12. Furthermore, ¶ 1.02 makes no reference to maximum horsepower, while ¶ 1.03 limits medium motors to 500 horsepower.

It follows that Congress did not aimlessly hurl the reference to MG1-1987 into the definition, but rather inserted it with care — first segmenting the definition into two clauses, only the second of which references MG1-1987, and then choosing language in the latter clause that mirrors the portion of MG1-1987 relating solely to physical size. Moreover, the presence of a horsepower limitation in the "medium motor" definition — and lack of a corresponding limitation in the "small motor" definition — indicates that MG1-1987 supplies horsepower limitations expressly. Accordingly, the reference to MG1-1987's specifications for frame size cannot be said to unambiguously incorporate all provisions of the publication into the definition, or to impose a 1-horsepower maximum.

---

the DOE's rulemaking, is entitled to special weight on the ground that NEMA authored the publication. *See post* at 43. The dissent's skewed point of view neglects the fundamental proposition that we are obliged to defer to the reasonable legal interpretations of expert and politically accountable executive agencies, affording no especial weight to the self-interested constructs advanced by regulated parties — even those who have drafted the particular language under examination.

Second, the familiar grammatical principle known as the last-antecedent rule strongly counsels against reading the express reference to MG1-1987 to apply unambiguously beyond the second clause. The last-antecedent rule is "[a]n elementary principle of statutory construction . . . which holds that ordinarily a clause modifies only its nearest antecedent." *Commonwealth of Va. v. Browner*, 80 F.3d 869, 877 (4th Cir. 1996). In *Barnhart v. Thomas*, the Supreme Court applied the last-antecedent rule to evaluate an agency's interpretation of a provision of the Social Security Act with a structure strikingly similar to the definition at issue here. The relevant statute in *Barnhart* provided:

> "An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his *previous work* but cannot, considering his age, education, and work experience, engage in *any other kind of substantial gainful work which exists in the national economy* . . . ." [42 U.S.C.] § 423(d)(2)(A).

540 U.S. at 23 (omission in original; emphases altered). The Social Security Administration, as the agency charged with administering the statute, interpreted the qualifier "which exists in the national economy" to apply only to the "any other kind of substantial gainful work" requirement, and not to the "previous work" requirement.

The Supreme Court's *Barnhart* decision recognized that the agency's interpretation "is at least a reasonable construction of the text and must therefore be given effect" under *Chevron*, reversing the court of appeals' ruling that the qualifier unambiguously applied to both requirements. 540 U.S. at 26. In so ruling, the Court reasoned that applying the qualifier to both of the requirements "disregards — indeed, is precisely contrary to — the grammatical 'rule of the last antecedent.'" *Id.* The Court further explained that "[w]hile this rule is not an

absolute and can assuredly be overcome by other indicia of meaning, . . . construing a statute in accord with the rule is quite sensible as a matter of grammar." *Id.* (internal quotation marks omitted). It follows in this case that the reference to MG1-1987 in the statutory definition's second clause requires merely that a small electric motor be built in the appropriate frame size, and that the reference — standing alone — does not unambiguously incorporate MG1-1987 Parts 10 and 12.

3.

As the preceding discussion demonstrates, the reference to MG1-1987 in the statutory definition's second clause is too flimsy to bear the weight that NEMA places on it. Consequently, we turn to the import of the phrase "NEMA general purpose alternating current single-speed induction motor," found in the definition's first clause. Here, too, we conclude that the DOE's interpretation is not unambiguously foreclosed at *Chevron*'s first step. We begin by reiterating that Congress had much less roundabout ways of imposing a horsepower limitation. Instead, by breaking the definition into two clauses and referencing MG1-1987's specifications for frame size only in the second clause, Congress went out of its way to incorporate but one specification in that publication — a specification that relates to physical size rather than power output.

We also observe that, although Congress adopted MG1-1987's language relating to physical size in the second clause, it used wholly different language — "NEMA general purpose . . . motor" — in the first clause. Congress's choice of terms is instructive in at least two respects. First, the choice demonstrates that Congress knew how to reference MG1-1987 when it so desired, and it did not do so in the first clause. Second, Congress's use of a different and seemingly broader term in the first clause suggests that, at minimum, the DOE could reasonably read that term to be informed by MG1-1987 but not to incorporate the delineations between small and medium motors in Parts 10 and 12 of that publication. *See Soliman*,

419 F.3d at 283 ("Where Congress has utilized distinct terms within the same statute, the applicable canons of statutory construction require that we endeavor to give different meanings to those different terms . . . .").

Moreover, not only does the definition lack an express horsepower limitation, but also ¶ 1.05 of MG1-1987 — on which NEMA so heavily relies — limits only the maximum, and not the minimum, horsepower of "general-purpose alternating-current motor[s]." *See* J.A. 14 (stating that such motors are "rated 200 horsepower and less"). NEMA must therefore seek refuge in another requirement of ¶ 1.05 — that such motors must be "designed in standard ratings with standard operating characteristics." *Id.* NEMA then directs us to the ratings and characteristics of small and medium motors found in Parts 10 and 12 of MG1-1987, which, according to NEMA, limit the horsepower of small motors.

NEMA's contention is thus unconvincing. First, ¶ 1.05 on its own terms provides only that general-purpose alternating-current motors must possess *some* standard ratings and operating characteristics; it does not specify *which* ratings and operating characteristics those must be. And, having already set an express 200-horsepower limitation for both small and medium general purpose motors in ¶ 1.05 — and a 500-horsepower limitation for medium motors in ¶ 1.03 — we would expect that MG1-1987 would be more explicit about any horsepower limitation applicable to small motors than the internal delineations in Parts 10 and 12 of the publication.[12] Second, the very presence of the second clause in the statutory definition suggests that Congress delineated between "small" and not-

---

[12]The dissent selectively quotes ¶ 1.05, *see post* at 38-39, excising its only express reference to horsepower — that general purpose motors are "rated 200 horsepower and less." Instead, the dissent, like NEMA, delves into the internal delineations of MG1-1987 Parts 10 and 12. As explained above, the express horsepower limitation in ¶ 1.05, with which the Final Rule complies, is the superior guide to the import of MG1-1987 on the statutory language.

"small" motors on the basis of frame size as described in ¶¶ 1.02 and 11.01.1 of MG1-1987, and not necessarily on the basis of the delineations found in Parts 10 and 12. As such, the statutory definition does not unambiguously incorporate the distinctions between small and medium motors found in Parts 10 and 12 of MG1-1987.

We do not reach or decide the broader question of whether the term "NEMA general purpose . . . motor" unambiguously incorporates the 1987 version of MG1. First, because the DOE has in fact interpreted the first clause to incorporate *some* aspects of MG1-1987, whether the DOE was obliged to interpret that clause to incorporate *any* aspect of MG1-1987 is not before us. Rather, the question we must decide is whether "NEMA general purpose . . . motor" unambiguously incorporates *all* aspects of MG1-1987. It does not.

Second, *Chevron*'s mandate to accord government agencies the flexibility to respond to changing conditions compels us to reserve judgment as to MG1-1987's ultimate import with respect to the first clause. *See* 467 U.S. at 863-64 ("An initial agency interpretation is not instantly carved in stone. On the contrary, the agency . . . must consider varying interpretations and the wisdom of its policy on a continuing basis."). The broader question of whether the term "NEMA general purpose . . . motor" unambiguously incorporates MG1-1987 could be presented later if, for example, the DOE seeks to regulate enclosed motors by adopting Earthjustice's interpretation of the statutory definition. *See supra* at 9. Because enclosed motors are "general purpose" motors only under more recent versions of MG1, declaring the first clause to unambiguously and exclusively incorporate the 1987 version could deprive the DOE of the flexibility to regulate enclosed motors, which some groups identify as a significant component of the relevant market. *See, e.g.*, J.A. 351. Worse, such a declaration could also deprive the DOE of the requisite flexibility without providing the agency the opportunity to defend

what it portrays as a "reasonable alternative interpretation." Resp't.'s Br. 38.

4.

NEMA has also scoured the legislative history seeking support for its view of the statutory definition, but to no avail. NEMA holds up a single sentence of a committee report accompanying the House of Representatives version of the legislation as proof that the definition unambiguously excludes all electric induction motors exceeding one horsepower. *See* H.R. Rep. No. 102-474, pt. 1, at 175 (1992), *reprinted in* 1992 U.S.C.C.A.N. 1953, 1998. That report states that the provision now codified at 42 U.S.C. § 6317, pursuant to which the DOE promulgated the Final Rule, "requires DOE to prescribe energy conservation standards for . . . electric motors of less than one horsepower that it determines would result in significant energy savings." *Id.*

We are unconvinced by NEMA's contention in this regard. Put simply, accepting NEMA's contention would require us to (1) rely on a negative inference from (2) a single sentence of unenacted legislative history that (3) the statute unambiguously incorporates the horsepower limitation NEMA urges, even as (4) that very legislative history does not reflect the same horsepower limitation, and (5) several more reliable indicia of meaning strongly support the DOE's interpretation.

To begin with, the horsepower limitation NEMA identifies in the report is not even an express one — while the report contemplates the DOE's regulation of sub-1 horsepower electric induction motors, it is silent with respect to other motors. In its submissions here, NEMA candidly asks that we infer the limitation based on the report's "less than one horsepower" language. Petr.'s Reply Br. 19. But even where we are dealing with statutory language and not mere snippets of legislative history, we will draw such a negative inference only where it appears that Congress meant to exclude the unmen-

tioned item. *See INS v. Fed. Labor Relations Auth.*, 4 F.3d 268, 272 (4th Cir. 1993) (declining to draw negative inference where "statute displays not an effort at legislative micro-management . . . , but rather a positive intention to leave complexities and trivialities to" agency). Additionally, in those *Chevron* cases where we have consulted legislative history, we have demanded only that the agency's interpretation be "consistent" with the legislative history. *Elm Grove Coal*, 480 F.3d at 296. Here, DOE's interpretation is consistent because sub-1 horsepower motors, the motors discussed in the committee report, are among those regulated by the Final Rule.

Finally, we observe that the legislative history itself belies its unreliability. If we were to take seriously its statement that all small electric motors must be "less than" 1 horsepower, then certain motors that even NEMA concedes are small under MG1-1987 Parts 10 and 12 (namely, 1-horsepower motors in a two-pole configuration) would fall outside the statutory definition. *See* Petr.'s Br. 20. On the other side of the coin, NEMA *does* challenge the Final Rule's inclusion of certain motors (namely, .75-horsepower motors in a six-pole configuration) that, because they are rated less than 1 horsepower, meet the condition supposedly described in the legislative history. *See id.* In light of the incongruities between MG1-1987's delineations and the committee report, we do not accept the report as reflecting a considered view of the intricacies of regulation — many of which Congress expressly delegated to the DOE in the Energy Policy Act — or a reliable means to ascertaining the import of the language in the statutory definition. Rather, the "uncertainties [in the report] illustrate the difficulty of relying on legislative history . . . and the advantage of . . . rest[ing] our holding on the statutory text." *Lamie*, 540 U.S. at 539-42 (declining to rely on legislative history where available material "creates more confusion than clarity about the congressional intent").

Of whatever usefulness legislative history may be in other *Chevron* cases, for the reasons discussed above, the available

history is not helpful here. It is conceivable, for instance, that where the application of textual canons and grammatical principles leaves a handful of competing and similarly plausible interpretations, strong legislative history against one interpretation would "restrict the range of choices that the bare text of the provision might otherwise seem to leave the administering agency." Caleb Nelson, *Statutory Interpretation* 766 (2011) (discussing purposes for which reviewing courts employ legislative history in *Chevron* cases). In *General Dynamics Land Systems, Inc. v. Cline*, by way of example, the Supreme Court acknowledged that the statute at issue was susceptible to the agency's interpretation "[i]n the abstract," yet refused to defer to the agency because the purpose of the statute, "30 years of judicial interpretation" and legislative inaction, as well as the legislative history, demonstrated "beyond a reasonable doubt" that the agency was "clearly wrong." 540 U.S. 581, 586, 590, 599-600 (2004).

Alternatively, perhaps strong legislative history could suggest an interpretation we would not glean from other tools of construction, such that the legislative history "rehabilitate[s] a reading that the courts would otherwise put off limits" to the agency. Nelson, *supra*, at 767; *cf. Bellum v. PCE Constructors, Inc.*, 407 F.3d 734, 739 (5th Cir. 2005) (affording *Chevron* deference to agency interpretation of statute that "is not inherently ambiguous," but where contrary interpretation "would frustrate the [statute's] unmistakable purpose," as evidenced in part by legislative history). But NEMA would have us invoke the legislative history not merely to choose between competing interpretations not resolved by the text or canons of construction, or to enable the agency to adopt an interpretation that fulfills the statutory purpose, but instead for the novel and unprecedented purpose of overriding an interpretation that is strongly supported by more reliable interpretive tools. We are leery of such an approach as a general proposition, and are more skeptical still of invoking the thin record here to conclude that DOE's interpretation is unambiguously foreclosed.

## C.

The second step of the *Chevron* analysis requires us to determine whether the interpretation reflected in the Final Rule "is a reasonable policy choice for the agency to make." *Brand X*, 545 U.S. at 986 (internal quotation marks omitted). Because the DOE logically looked to market realities in formulating its interpretation, we conclude that DOE's interpretation — that both clauses of the definition are informed by MG1-1987, but that they do not incorporate the delineations between small and medium motors found in MG1-1987 Parts 10 and 12 — is a reasonable policy choice.

### 1.

In reaching its interpretation, the DOE recognized (and agreed with NEMA) that the import of MG1-1987 informs the meaning of the term "NEMA general purpose . . . motor" in the statutory definition's first clause. The DOE went on to recognize, however, that Congress chose to break the definition into two clauses, the second of which singles out MG1-1987's specification relating to the physical size of "small machine[s]." J.A. 13. Faced with the structure of the definition and the intricacies of MG1-1987, DOE commendably looked to industry practice and market realities to guide its understanding of the definition. *See* Determination, 71 Fed. Reg. 38799, 38800 (published July 10, 2006) (explaining that DOE "began the analysis for this determination by collecting information from manufacturers of small motors and others" and that, "[s]ubsequently, the Department received data and information, including that provided by . . . [NEMA]").

DOE's investigation of the market revealed that electric induction motor manufacturers, including some NEMA members, regularly interpret the "general-purpose alternating-current motor" definition in MG1-1987 ¶ 1.05 as DOE does. That is to say, they manufacture and market 1-plus horsepower motors in a two-digit frame number series (as specified

in the MG1-1987 definition of small machine and the EPCA definition of small electric motor), and conform those motors to the standard ratings and operating characteristics applicable to what MG1-1987 Parts 10 and 12 would call medium motors. *See* J.A. 420-30 (manufacturer catalog excerpts). Notably, NEMA itself made this point in its comments to DOE. *See* J.A. 121 ("NEMA Design Types A, B, C, and D are not defined for polyphase small electric motors. However, a search of manufacturers' catalogs will indicate that it is common for a polyphase 1 hp small electric motor to be designed to the same performance requirements as a polyphase 1 hp medium electric motor. This is expected, if not demanded, by the motor users.").

In light of the information gleaned from manufacturers and NEMA itself, the DOE quite sensibly decided that the electric induction motors subject to the rulemaking ought to include motors actually manufactured, marketed, and sold as general purpose motors and built in a two-digit frame number series, even if the power output of those motors is not always identified as corresponding to the output of "small" machines as the term is used in certain tables of MG1-1987. As the DOE explains, "[t]he absence of ratings in some tables in MG1-1987 does not keep such motors off the market; nor should it keep such motors from complying with energy conservation standards." Resp't.'s Br. 33.

2.

Finally, NEMA contends that the DOE's position in this proceeding is not entitled to deference because it is a *post hoc* litigation position that contradicts the view it set forth in the rulemaking process. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212-13 (1988). NEMA seizes on two sources to contend that the DOE has contradicted itself in defending the Final Rule in this challenge. First, NEMA points to language in the 2007 scoping document, which states that, "[a]s seen in [Tables 10-1 and 10-2], MG1-1987 identifies small

induction motors as motors with horsepower ratings from 1 millihorsepower up to 1 horsepower." J.A. 82. Second, NEMA relies on DOE's response to Earthjustice in the Notice and Final Rule that MG1-1987 applies to "all facets" of the statutory definition. Notice, 74 Fed. Reg. at 61421; J.A. 537.

We are unable to find NEMA's contention persuasive. To begin with, we are confident that the DOE's arguments to this Court are not at odds with the interpretation reflected in the Final Rule. Rather, the DOE's papers simply elaborate on the legal theory underpinning the Final Rule's interpretation of the statutory definition. We are mindful that "an agency's action may not be upheld on grounds other than those relied on by the agency" in the actual course of its decisionmaking. *Boston & Maine*, 503 U.S. at 420 (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 88 (1943)). But deference is appropriate, and we need not remand, when the agency's litigation papers merely set forth an interpretation that was a "necessary presupposition" of its underlying action. *Id.* As the Supreme Court has explained, "the fact that the [agency] did not in so many words articulate its interpretation" in the underlying action "does not mean that we may not defer to that interpretation, since the only reasonable reading of" the explanation offered by the agency in the underlying action, "and the only plausible explanation of the issues that the [agency] addressed after considering the factual submissions by all of the parties, is that the [agency's action] was based on" the interpretation it proffered in subsequent litigation. *Id.*

The position the DOE advances here simply does not deviate from the view it articulated in the course of the rulemaking — that certain electric induction motors with outputs between 1 and 3 horsepower, if built in a two-digit frame series, are small electric motors. *Cf. Coeur Ala., Inc. v. Southeast Ala. Conservation Council*, 129 S. Ct. 2458, 2474-77 (2009) (rejecting argument that agency memorandum interpreting agency's regulations contradicted agency's prior view). True enough, the DOE maintains that it is not *required*

to interpret the term "NEMA general purpose . . . motor" to incorporate all provisions of MG1-1987. *See* Resp't.'s Br. 20-21 ("The bare statutory reference to MG1-1987 at the end of [the statutory definition] was not intended to incorporate *all* elements of that industry standards publication into the statute. . . . Instead, the statute refers to MG1-1987 only in a limited context: those industry standards define the 'two digit frame number series' in which a small electric motor is built."); *id.* at 24.

Nevertheless, it does not follow that DOE's position contradicts the explanation it offered in the Final Rule. After all, the DOE — both in this Court and in the Final Rule — *has* interpreted both clauses of the statutory definition to refer to and incorporate MG1-1987. *See* Resp't.'s Br. 29 ("DOE has interpreted the earlier part of the phrase — 'NEMA general purpose . . . motor' — to refer to MG1-1.05, but not to incorporate the distinctions between small and medium machines in Parts 10 and 12."); Final Rule, 75 Fed. Reg. at 10883. Although the DOE has not interpreted the definition to incorporate the delineations between small and medium electric induction motors in MG1-1987 Parts 10 and 12, the DOE has never taken that position and, as explained in Part III.B, the statutory language does not require it to do so.

In support of its proposition in this respect, NEMA makes much ado about language in the 2007 scoping document and the DOE's statements that MG1-1987 applies to "all facets" of the statutory definition, but these are in the nature of red herrings. Regarding the 2007 document, we observe first that the language upon which NEMA seizes merely describes certain tables found in MG1-1987, and is not a conclusive (or even preliminary) pronouncement on the import of those tables for the meaning of the statutory definition. This is borne out by the 2007 document's disclaimer, found on the same page, that "[t]he MG-1 standards discussed in [the section dealing with horsepower ratings] are not explicitly referenced by the definitions of any of the [MG-1] terms listed

above." J.A. 82. Nor does the "all facets" language support NEMA's contention. That language was included to address a separate question raised by Earthjustice — the regulation of enclosed as well as open motors — and not the horsepower ratings of motors subject to the rulemaking. No observer could have mistaken these statements to refer to horsepower ratings, as the statements were made in the same breath that DOE interpreted the more-powerful motors to fall within the statutory definition. Moreover, the "all facets" language is not in tension with interpreting the definition to include more-powerful motors, as the DOE in fact interpreted MG1-1987 to apply (to some extent) to the first clause of the definition.

To the extent that DOE did not state its interpretation in exacting detail in the rulemaking — and elaborated on its interpretation in arguments to this Court — NEMA's argument yet flounders. The DOE was under no obligation to go to such lengths to defend its interpretation at the time it promulgated the Final Rule; it is enough that the Final Rule and the accompanying explanation set forth a coherent interpretation and a plausible rationale underpinning it. *See Madison Gas & Elec. Co. v. EPA*, 25 F.3d 526, 529 (7th Cir. 1994) (articulating the "undemanding standard" that, under *Chevron*, "[a]lthough the [agency] is free to choose any reasonable interpretation for an undefined term in the statutes it administers, it must exhibit the reasons for its choice and those reasons must be at least plausible" (internal quotation marks and citations omitted)). Indeed, the Supreme Court has instructed that "[e]ven when an agency explains its decision with less than ideal clarity, a reviewing court will not upset the decision on that account if the agency's path may reasonably be discerned." *Ala. Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 497 (2004) (internal quotation marks omitted).

We will not hold against the DOE the more sophisticated legal arguments it sets forth in its submissions to this Court. The DOE is tasked, in the first instance, with fulfilling its statutory mandate. Of course, this responsibility includes provid-

ing reasons for its actions sufficient to permit assessment by a reviewing court. *See Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 654; *Chenery*, 318 U.S. at 94. Most assuredly, however, this responsibility does not oblige the agency to provide exhaustive, contemporaneous legal arguments to preemptively defend its action. Similarly, when (and if) its action is challenged, the DOE is not hamstrung to limit its legal arguments to the four corners of the administrative record. In promulgating the Final Rule, the DOE set forth a coherent interpretation of the statutory definition and gave a sufficient explanation thereof. And in response to NEMA's challenge, it was not only expected but also a duty that the DOE would further explain and elucidate its interpretation and how it fits within the *Chevron* framework. Neither of these actions undermine the weight given to DOE's interpretation.

In contending that the interpretation set forth by the DOE in its papers warrants no deference, NEMA relies heavily on *Bowen v. Georgetown University Hospital*. Such reliance is misplaced. In *Bowen*, the Supreme Court refused to afford *Chevron* deference to an agency counsel's interpretation of a statute "where the agency itself has articulated no position on the question" — in other words, where the agency's litigating position was "wholly unsupported by regulations, rulings, or administrative practice." 488 U.S. at 212. The Court further explained that even if, as a general principle, it would defer to an agency's litigating position in the absence of such supporting authority, it would not do so there because the agency's litigating position did not reflect a "reasoned and consistent view of the" statutory provision, but in fact was "contrary to the . . . view of that provision advanced in past cases." *Id.* at 212-13.

The present circumstances scarcely could be more distinct from *Bowen*. Most obviously, the DOE's position as advanced in its papers is hardly "wholly unsupported by" the Final Rule. *See Bowen*, 488 U.S. at 212. Indeed, quite the contrary

— as explained above, the DOE's pronouncements in and prior to the Final Rule sufficiently set forth and justify its interpretation, and the DOE's position here is fully consistent with that interpretation. As a result, it cannot be said that the DOE's papers constitute "nothing more than an agency's convenient litigating position." *See id.* at 213.[13]

IV.

Pursuant to the foregoing, we deny NEMA's petition for review.

*PETITION FOR REVIEW DENIED*

SHEDD, Circuit Judge, dissenting:

When viewed in context, the statute we are reviewing is clearly unambiguous, and the Department of Energy's ("DOE") final rule is contrary to the statute and Congress's clear direction. Therefore, I would grant the petition, vacate the final rule, and remand the matter to DOE for action consistent with the law.

Nineteen years ago, Congress enacted the Energy Policy Act of 1992 (the "Act"), part of which directed DOE to prescribe energy conservation standards for small electric motors. *See* 42 U.S.C. § 6317(b). The Act defines "small elec-

---

[13]We need not and do not rule today that the interpretation adopted by the DOE is the only permissible interpretation of the statutory definition. Rather, "[i]t suffices to conclude, as we do," that the statutory definition "does not unambiguously require a different interpretation, and that [DOE]'s regulation is an entirely reasonable interpretation of the text." *Barnhart*, 540 U.S. at 30. In the course of the rulemaking, the DOE received comments regarding the scope of the rulemaking not only from NEMA but also from environmental groups and other interested parties. Faced with an ambiguous definition and plausible arguments that the definition could have an even broader meaning, we glean nothing unreasonable from the DOE's decision to chart a course between extremes.

tric motor" as "a NEMA[1] general purpose alternating current single-speed induction motor, built in a two-digit frame number series in accordance with NEMA Standards Publication MG1-1987." 42 U.S.C. § 6311(13)(G)). In the House Report accompanying the Act, Congress explained the Act "requires DOE to prescribe energy conservation standards for . . . electric motors of *less than one horsepower*." H.R. REP. 102-474(I), at 208 (1992), reprinted in 1992 U.S.C.C.A.N. 1953, 1998 (emphasis added). The dispositive question before us is straightforward: as used in the Act, what does "small electric motor" mean?

The first step in answering that question is deciding whether "in accordance with NEMA Standards Publication MG1-1987" modifies the entire definition or only "two-digit frame number series." Under the facts in this case, there would appear to be no doubt that it applies to the whole definition because both NEMA and DOE have consistently agreed throughout the rulemaking process that the reference to NEMA Standards Publication MG1-1987 applies to all facets of the statutory definition of small electric motors. In other words, the entire definition in 42 U.S.C. § 6311(13)(G) should be read in accordance with MG1-1987.

However, the majority has adopted DOE's newly announced litigation posture that MG1-1987 applies only to "two-digit frame number series" in 42 U.S.C. § 6311(13)(G).[2]

---

[1]The petitioner in this appeal, National Electrical Manufacturers Association ("NEMA"), is a not-for-profit trade association that represents a variety of electrical manufacturers. Among other things, NEMA develops and publishes standards relating to electrical products, including the 1987 edition of the Standards Publication MG1 at issue here.

[2]In this petition for review, DOE takes the position — for the first time — that the "in accordance with" language modifies only the second "clause" of the definition. This is completely contrary to their stated position throughout the rulemaking process. *Compare* 74 Fed. Reg. 61421 ("[DOE agrees] with NEMA that the reference *MG1-1987 applies to all facets of the statutory definition of a small electric motor. The language*

In reaching its decision, the majority focuses primarily on the placement of the comma[3] and selective canons of statutory construction to determine that the phrase "in accordance with NEMA Standards Publication MG1-1987" does not apply to "a NEMA general purpose alternating current single-speed induction motor." Accordingly, the majority finds that "small electric motor" is statutorily limited by a motor's frame size, but not by the amount of horsepower a motor has.

But the obvious reading of the definition is that "in accordance with NEMA Standards Publication MG1-1987" modifies the entire statutory definition of "small electric motor." The dual references to "NEMA" unmistakably link the entire definition together as a whole, *see U.S. v. Atlantic Research Corp.*, 551 U.S. 128, 135 (2007) ("Statutes must 'be read as a whole.'"), and nothing suggests that the "in accordance with" language should not be read as applying to the entire definition, *see Porto Rico Ry., Light & Power Co. v. Mor*, 253 U.S. 345, 348 (1920) ("When several words are followed by

---

of the statute specifies that the requirements of MG1-1987 apply in determining what constitutes a small electric motor. . . . The statutory definition of a small electric motor is bound to the definition of a general-purpose alternating-current motor as defined in NEMA MG1-1987.") (emphasis added), *with* Resp. Br. at 29 ("As explained above, the reference to MG1-1987 comes later, and expressly modifies only the phrase 'built in a two-digit frame number series.'"). This switch in position appears to be an acknowledgement by DOE that its final rulemaking could not otherwise withstand the challenge by NEMA. Such a post-hoc litigation position is entitled to no weight or deference. *See, e.g.*, *Wheeler v. Newport News Shipbuilding & Dry Dock Co.*, 637 F.3d 280, 290 (4th Cir. 2011) (showing no deference to the agency's interpretation where it was merely a litigating position); *Village of Barrington v. Surface Transp. Bd.*, 636 F.3d 650, 660 (D.C. Cir. 2011) (giving no deference to an agency's "'litigating positions' raised for the first time on judicial review").

[3]While the location of the comma is part of the majority's analysis, its removal would not in any material manner affect its analysis or its ultimate result. See the majority's discussion of the last antecedent rule, *ante* at 22-23.

a clause which is applicable as much to the first and other words as to the last, the natural construction of the language demands that the clause be read as applicable to all."). This reading is bolstered by the fact that the phrase "general purpose alternating current" motor, used in the first line of the statutory definition, is lifted verbatim from Section 1.05 of MG1-1987 (which section DOE and the majority would at least *partially* apply, *see ante*, at 31-32).[4] Thus, in my opinion, § 6311(13)(G) unambiguously incorporates all of MG1-1987, just as if MG1-1987 had been written into the statute. *See, e.g.*, *United States v. Myers*, 553 F.3d 328, 331 (4th Cir. 2009) ("The general rule is that when one statute adopts a provision of another statute by specific reference, it is as if the adopting statute had itself spelled out the terms of the adopted provision . . . .").

Therefore, we turn to MG1-1987 to determine what "small electric motor" means, and it is clear that MG1-1987 does not include standards for *small* motors greater than one horsepower.[5] A general purpose alternating-current motor is defined in Section 1.05 of MG1-1987 (emphasis added):

A general-purpose alternating-current motor is an

---

[4]In its new litigation position, DOE seeks to minimize the relevance of MG1-1987. But DOE's position underscores its inconsistency. Despite arguing that MG1-1987 (which DOE describes as "decades-old industry standards") applies only to the "second clause" of § 6311(13)(G), throughout its briefs DOE repeatedly interprets the "first clause" in the definition in light of selective provisions and standards in MG1-1987. *See, e.g.*, Resp. Br. at 29 ("DOE has interpreted the earlier part of the phrase — 'NEMA general purpose . . . motor' — to refer to MG1-1.05 . . . ."); *cf.* J.A. 146, 538 (acknowledging that "the 1987 version is the only applicable version of NEMA MG1.").

[5]DOE concedes this point, acknowledging in the Final Rule "that NEMA MG1-1987 does not provide ratings for small motors of the identified higher horsepower ratings" (i.e. motors of greater than one horsepower which DOE is seeking to regulate under this rulemaking). 75 Fed. Reg. at 10883.

induction motor . . . which incorporates . . . the following:

. . . .

(3) *Service factor* in accordance with MG1-12.47.

. . . .

It is designed in *standard ratings* with *standard operating characteristics* . . . .[6]

These factors, ratings, and operating characteristics are defined more fully in various sections of MG1-1987. First, Section 1.05 directs us to the service factors found in Section 12.47 (and illustrated in Table 12-2); those factors are delineated in terms of horsepower and speed ratings and clearly distinguish between small and medium motors; *small* motors are one horsepower or less. Second, the "standard ratings" referenced in Section 1.05 are found in MG1-1987 Part 10. There, Section 10.32 and Table 10-1, both entitled "Horsepower and Speed Ratings," illustrate the horsepower and speed ratings for small and medium induction motors — *small* motors do not exceed one horsepower. Finally, Section 1.05's "standard operating characteristics" requirement is found in Section 12.32.2. This section provides the standard

---

[6]The majority states that I "selectively" quoted Section 1.05, *ante* at 24 n.12, with the apparent implication that I have purposely avoided relevant statutory provisions. Such an implication is unfounded. I have expressly noted only the provisions of Section 1.05 that are relevant to the question presented in this case, which is the maximum horsepower limitation for small electric motors. The 200 horsepower ceiling, which includes *medium* motors, in no way sets the maximum horsepower for *small* electric motors. Neither the 200 horsepower ceiling nor other requirements found in Section 1.05 but which I have not expressly noted — such as "open construction," "continuous duty," or "insulation systems" — address the question presented in this case. Not even DOE argues that small horsepower motors here exceed 3 horsepower.

locked-rotor torque operating characteristics for small and medium motors — *small* motors include only motors up to one horsepower.

Thus, Section 1.05 of MG1-1987, by incorporating Parts 10 and 12, provides the full and complete definition of a general purpose alternating current motor. And that complete definition in Section 1.05 provides a clear demarcation between "small" and "medium" general purpose alternating current motors. As noted therein, *small motors do not exceed one horsepower*.

Although the majority concludes that the definition of small electric motor adopts MG1-1987's standards only as it applies to frame size, it endorses DOE's fallback position that MG1-1987 does not clearly contain a horsepower limitation even if it were to be applied in its entirety. Although acknowledging that Section 1.05 of MG1-1987 and Parts 10 and 12 do provide standards and ratings applicable to small electric motors, the majority and DOE inexplicably conclude the statutory definition does not incorporate the distinctions between small and medium motors found in those specified standards and ratings. *Ante*, at 24. In fact, under this interpretation, the majority effectively excises the word "small" from the very term — small electric motor — the statute is defining. Thus, under the majority's view, the MG1-1987 definition of a *small* motor includes motors deemed by MG1-1987 to be *medium* motors.

Congress certainly intended no such result. By referring to MG1-1987 in the statute, Congress incorporated the publication in its entirety, including the ratings and standards which defined small motors. Thus, Congress intended to grant DOE authority only to regulate small electric motors, which in 1992 Congress and NEMA understood to be motors of one horsepower or less.[7] In fact, the congressionally incorporated publi-

---

[7]MG1-1987 was incorporated as it existed in 1992 when Congress referenced it in the Act. The fact that DOE has "commendably looked to indus-

cation MG1-1987 contains no reference — directly or indirectly — to "small" motors greater than one horsepower.

Lest there be any doubt about this point, Congress's clear understanding is expressed explicitly in the language of the House Report, which states that the Act "requires DOE to prescribe energy conservation standards for . . . electric motors of *less than one horsepower.*" H.R. REP. 102-474(I), at 208 (1992), reprinted in 1992 U.S.C.C.A.N. 1953, 1998 (discussing 42 U.S.C. § 6317[8]) (emphasis added). The House Report language is important because it explains what the statutory language at issue meant to the members of Congress who had expertise over these matters; namely, the membership of the House Energy and Commerce Committee. Other members of Congress look to such Report language to understand how the bill works, what it means, and how it is to be applied. *See, e.g.*, *Garcia v. United States*, 469 U.S. 70, 76 (1984) ("In surveying legislative history we have repeatedly stated that the authoritative source for finding the Legislature's intent lies in the Committee Reports on the bill, which 'represen[t] the considered and collective understanding of those Congressmen involved in drafting and studying proposed legislation.'" (quoting *Zuber v. Allen*, 396 U.S. 168, 186 (1969))). Second only to the words used in the statute itself, a committee report is perhaps the most definitive expression of congressional intent. Here, the impact of these words is heightened because we have more than a general statement by Congress from which we would need to draw an inference. This is a specific congressional expression on the very issue before us. Indeed, congressional intent on this specific issue is clear: DOE is

try practice" and "logically looked to market realities," *ante* at 29, is of no moment. That the industry may have developed motor technology not contemplated in 1992 does not authorize DOE to extend its authority beyond what the statute authorizes.

[8]DOE acknowledges it promulgated the final rule at issue pursuant to the authority delegated to it in 42 U.S.C. § 6317.

given authority "to prescribe energy conservation standards for . . . electric motors of *less than one horsepower*" — nothing more.[9] DOE and the majority cavalierly dismiss this legislative language or read it in a fashion that turns the congressional directive on its head.

The majority first dismisses the House Report language because it believes Congress did not speak directly enough. According to the majority, although the House Report contemplates regulation of small motors "less than one horsepower," it is silent as to other horsepower sizes, and to infer such a horsepower limitation is to draw an impermissible "negative inference." But reading the House Report language as limited to motors of one horsepower or less is not based on a negative inference; it is based on the *positive* statement of what Congress intended by this specific provision of the Act — limiting DOE's regulatory authority to motors of one horsepower or less. *See, e.g.*, *Am. Petroleum Inst. v. U.S. Envtl. Prot. Agency*, 198 F.3d 275, 278 (D.C. Cir. 2000) ("[I]f Congress makes an explicit provision for apples, oranges and bananas, it is most unlikely to have meant grapefruit.").

Then, to the extent the majority would consider this congressional language at all, it adopts the overreaching view asserted by DOE that even if Congress indicated it wanted to regulate motors of one horsepower or less, DOE has acted consistently with this requirement by regulating motors of even larger horsepower as long as the one horsepower motors are included in such a regulation.[10] This approach turns Con-

---

[9]Although Congress stated the limitation as "less than one horsepower," that imprecise wording has no real significance here. DOE affirmatively asserts it makes no difference, and the majority's analysis is not based on this particular wording. DOE understands the question before us concerns motors of one horsepower or less. *See* J.A. 82 (stating DOE's acknowledgment in the scope of coverage for the proposed rulemaking that "MG1-1987 identifies small induction motors as motors with horsepower ratings from 1 millihorsepower up to 1 horsepower").

[10]*See* Resp. Br. at 31-33 (arguing that by regulating electric motors up to three horsepower, DOE also regulated electric motors of less than one horsepower and was therefore acting consistently with the express intent of Congress).

gress's pronouncement on its head: it would mean if Congress authorizes a specific, *limited* action in a particular regulatory area, it has authorized *all* regulatory action in that area. The suggestion that a partial grant of governmental authority equals a complete grant of authority is astonishing — only in "government speak" can "less than one horsepower" actually mean "up to three horsepower."

In the final analysis, DOE asks us to: (1) ignore the fact that Congress statutorily incorporated the entirety of NEMA Standards Publications MG1-1987; (2) ignore the word "small" in our effort to understand what Congress meant by "small electric motor;" (3) ignore the fact that for purposes of this litigation DOE has completely reversed its longstanding interpretation of the statute; (4) ignore NEMA's considered view of a NEMA publication which Congress intentionally incorporated into the statute; and (5) ignore specific, relevant House Report language or in the alternative accept DOE's reading which turns that language on its head. We should reject all of these premises.[11]

We should also reject DOE's new position because it alters the fundamental relationship between Congress and the bureaucracy. Instead of giving a real world assessment of Congress's statements, the majority's analysis shifts control of this entire regulatory area from Congress to the bureaucracy, absent congressional authorization. *See Brown & Wil-*

---

[11]Contrary to the majority's suggestion, I do not believe the majority has been "hoodwinked." *Ante*, at 20 n.11. This is a description the majority applies to itself. I merely point out that the majority has accepted DOE's new position on how to read the statutory definition, a position which DOE indisputably takes for the first time in this litigation. Further, perhaps to deemphasize DOE's changed position, the majority asserts that NEMA has "adopted [its current view] for the express purpose of challenging the DOE's rulemaking." *Id.* The majority has the power to reject NEMA's view of a NEMA document, but there is no basis in the record to assert that NEMA, like DOE, has recently changed its position on how the definition is to be read.

*liamson Tobacco Corp. v. Food & Drug Admin.*, 153 F.3d 155, 161 (4th Cir. 1998) ("[A]gency power is not the power to make law. Rather, it is the power to adopt regulations to carry into effect the will of Congress as expressed by the statute." (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 213-14 (1976) (internal quotation marks omitted))). What DOE proposes is not gap-filling; it is misreading congressional intent to justify an agency claiming more authority. No Supreme Court or Fourth Circuit case requires us to take such a dramatic step with this statute, and I would decline to do so.

At bottom, this is more than an academic exercise: we are deciding what Congress meant by "small electric motor" in a statute that has actual impact in the real world. When we review a congressional enactment, we should be about the business of ascertaining and following congressional intent, which "is of particular importance where, as here, an agency is attempting to expand the scope of its jurisdiction." *Brown & Williamson*, 153 F.3d at 162) ("[T]he more intense scrutiny that is appropriate when the agency interprets its own authority may be grounded in the unspoken premise that government agencies have a tendency to swell, not shrink, and are likely to have an expansive view of their mission." (quoting *Hi-Craft Clothing Co. v. NLRB*, 660 F.2d 910, 916 (3d Cir. 1981))). We simply should not apply selective canons of construction or caselaw to grant authority to DOE which it can only justify by creating a litigation position at odds with its longstanding regulatory position. The statute, confirmed by the House Report language, is clear and unambiguous that small electric motors are motors of one horsepower or less.

Accordingly, I respectfully dissent.