**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 14-1158

DAVID KING; DOUGLAS HURST; BRENDA LEVY; ROSE LUCK,

Plaintiffs - Appellants,

v.

SYLVIA MATTHEWS BURWELL, in her official capacity as U.S. Secretary of Health and Human Services; UNITED STATES DEPARTMENT OF HEALTH & HUMAN SERVICES; JACOB LEW, in his official capacity as U.S. Secretary of the Treasury; UNITED STATES DEPARTMENT OF THE TREASURY; INTERNAL REVENUE SERVICE; JOHN KOSKINEN, in his official capacity as Commissioner of Internal Revenue,

Defendants – Appellees,

------------------------------

SENATOR JOHN CORNYN; SENATOR TED CRUZ; SENATOR ORRIN HATCH; SENATOR MIKE LEE; SENATOR ROB PORTMAN; SENATOR MARCO RUBIO; CONGRESSMAN DARRELL ISSA; PACIFIC RESEARCH INSTITUTE; THE CATO INSTITUTE; THE AMERICAN CIVIL RIGHTS UNION; JONATHAN H. ADLER; MICHAEL F. CANNON; STATE OF OKLAHOMA; STATE OF ALABAMA; STATE OF GEORGIA; STATE OF WEST VIRGINIA; STATE OF NEBRASKA; STATE OF SOUTH CAROLINA; CONSUMERS' RESEARCH; STATE OF KANSAS; THE GALEN INSTITUTE,

Amici Supporting Appellants,

COMMONWEALTH OF VIRGINIA; AMERICA'S HEALTH INSURANCE PLANS; AMERICAN CANCER SOCIETY; AMERICAN CANCER SOCIETY CANCER ACTION NETWORK; AMERICAN DIABETES ASSOCIATION; AMERICAN HEART ASSOCIATION; PUBLIC HEALTH DEANS, CHAIRS, AND FACULTY; MEMBERS OF CONGRESS AND STATE LEGISLATURES; AMERICAN HOSPITAL ASSOCIATION; ECONOMIC SCHOLARS; FAMILIES USA; AARP; NATIONAL HEALTH LAW PROGRAM,

Amici Supporting Appellees.

Appeal from the United States District Court for the Eastern District of Virginia, at Richmond. James R. Spencer, Senior District Judge. (3:13-cv-00630-JRS)

_____

Argued: May 14, 2014                    Decided: July 22, 2014

_____

Before GREGORY and THACKER, Circuit Judges, and DAVIS, Senior Circuit Judge.

_____

Affirmed by published opinion. Judge Gregory wrote the opinion, in which Judge Thacker and Senior Judge Davis joined. Judge Davis wrote a concurring opinion.

_____

**ARGUED:** Michael Anthony Carvin, JONES DAY, Washington, D.C., for Appellants. Stuart F. Delery, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. Stuart Alan Raphael, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Amicus Commonwealth of Virginia. **ON BRIEF:** Yaakov M. Roth, Jonathan Berry, JONES DAY, Washington, D.C., for Appellants. Dana J. Boente, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia; Beth S. Brinkmann, Deputy Assistant Attorney General, Mark B. Stern, Alisa B. Klein, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. Michael E. Rosman, CENTER FOR INDIVIDUAL RIGHTS, Washington, D.C.; Carrie Severino, THE JUDICIAL EDUCATION PROJECT, Washington, D.C.; Charles J. Cooper, David H. Thompson, Howard C. Nielson, Jr., Brian W. Barnes, COOPER & KIRK, PLLC, for Amici Senator John Cornyn, Senator Ted Cruz, Senator Orrin Hatch, Senator Mike Lee, Senator Rob Portman, Senator Marco Rubio, and Congressman Darrell Issa. C. Dean McGrath, Jr., MCGRATH & ASSOCIATES, Washington, D.C.; Ilya Shapiro, CATO INSTITUTE, Washington, D.C.; Bert W. Rein, William S. Consovoy, J. Michael Connolly, WILEY REIN LLP, Washington, D.C., for Amici Pacific Research Institute, The Cato Institute, and The American Civil Rights Union. Andrew M. Grossman, BAKER HOSTETLER, Washington, D.C., for Amici Jonathan H. Adler and Michael F. Cannon. E. Scott Pruitt, Attorney General, Patrick R. Wyrick, Solicitor General, OFFICE OF THE ATTORNEY GENERAL OF OKLAHOMA, Oklahoma City, Oklahoma; Luther Strange, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF ALABAMA, Montgomery, Alabama; Sam Olens, Attorney General,

OFFICE OF THE ATTORNEY GENERAL OF GEORGIA, Atlanta, Georgia; Patrick Morrisey, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF WEST VIRGINIA, Charleston, West Virginia; Jon Bruning, Attorney General, Katie Spohn, Deputy Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NEBRASKA, Lincoln, Nebraska; Alan Wilson, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF SOUTH CAROLINA, Columbia, South Carolina, for Amici State of Oklahoma, State of Alabama, State of Georgia, State of West Virginia, State of Nebraska, and State of South Carolina. Rebecca A. Beynon, KELLOGG, HUBER, HANSEN, TODD, EVANS & FIGEL, P.L.L.C., Washington, D.C., for Amicus Consumers' Research. Derek Schmidt, Attorney General, Jeffrey A. Chanay, Deputy Attorney General, Stephen R. McAllister, Solicitor General, Bryan C. Clark, Assistant Solicitor General, OFFICE OF THE ATTORNEY GENERAL OF KANSAS, Topeka, Kansas; Jon Bruning, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NEBRASKA, Lincoln, Nebraska, for Amici State of Kansas and State of Nebraska. C. Boyden Gray, Adam J. White, Adam R.F. Gustafson, BOYDEN GRAY & ASSOCIATES, Washington, D.C., for Amicus The Galen Institute. Mark R. Herring, Attorney General, Cynthia E. Hudson, Chief Deputy Attorney General, Trevor S. Cox, Deputy Solicitor General, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Amicus Commonwealth of Virginia. Joseph Miller, Julie Simon Miller, AMERICA'S HEALTH INSURANCE PLANS, Washington, D.C.; Andrew J. Pincus, Brian D. Netter, MAYER BROWN LLP, Washington, D.C., for Amicus America's Health Insurance Plans. Mary P. Rouvelas, AMERICAN CANCER SOCIETY CANCER ACTION NETWORK, Washington, D.C.; Brian G. Eberle, SHERMAN & HOWARD L.L.C., Denver, Colorado, for Amici American Cancer Society, American Cancer Society Cancer Action Network, American Diabetes Association, and American Heart Association. Clint A. Carpenter, H. Guy Collier, Ankur J. Goel, Cathy Z. Scheineson, Lauren A. D'Agostino, MCDERMOTT WILL & EMERY LLP, Washington, D.C., for Amicus Public Health Deans, Chairs, and Faculty. Elizabeth B. Wydra, Douglas T. Kendall, Simon Lazarus, Brianne J. Gorod, CONSTITUTIONAL ACCOUNTABILITY CENTER, Washington, D.C., for Amicus Members of Congress and State Legislators. Melinda Reid Hatton, Maureen Mudron, AMERICAN HOSPITAL ASSOCIATION, Washington, D.C.; Dominic F. Perella, Sean Marotta, HOGAN LOVELLS US LLP, Washington, D.C., for Amicus American Hospital Association. Matthew S. Hellman, Matthew E. Price, Julie Straus Harris, Previn Warren, JENNER & BLOCK LLP, Washington, D.C., for Amicus Economic Scholars. Robert N. Weiner, Michael Tye, ARNOLD & PORTER LLP, Washington, D.C., for Amicus Families USA. Stuart R. Cohen,

3

Michael Schuster, AARP FOUNDATION LITIGATION, Washington, D.C.; Martha Jane Perkins, NATIONAL HEALTH LAW PROGRAM, Carrboro, North Carolina, for Amici AARP and National Health Law Program.

---

GREGORY, Circuit Judge:

The plaintiffs-appellants bring this suit challenging the validity of an Internal Revenue Service ("IRS") final rule implementing the premium tax credit provision of the Patient Protection and Affordable Care Act (the "ACA" or "Act"). The final rule interprets the ACA as authorizing the IRS to grant tax credits to individuals who purchase health insurance on both state-run insurance "Exchanges" and federally-facilitated "Exchanges" created and operated by the Department of Health and Human Services ("HHS"). The plaintiffs contend that the IRS's interpretation is contrary to the language of the statute, which, they assert, authorizes tax credits only for individuals who purchase insurance on state-run Exchanges. For reasons explained below, we find that the applicable statutory language is ambiguous and subject to multiple interpretations. Applying deference to the IRS's determination, however, we uphold the rule as a permissible exercise of the agency's discretion. We thus affirm the judgment of the district court.

## I.

In March of 2010, Congress passed the ACA to "increase the number of Americans covered by health insurance and decrease the cost of health care." Nat'l Fed'n of Indep. Bus. v. Sebelius, 132 S. Ct. 2566, 2580 (2012) (NFIB). To increase the

5

availability of affordable insurance plans, the Act provides for the establishment of "Exchanges," through which individuals can purchase competitively-priced health care coverage. See ACA §§ 1311, 1321. Critically, the Act provides a federal tax credit to millions of low- and middle-income Americans to offset the cost of insurance policies purchased on the Exchanges. See 26 U.S.C. § 36B. The Exchanges facilitate this process by advancing an individual's eligible tax credit dollars directly to health insurance providers as a means of reducing the up-front cost of plans to consumers.

Section 1311 of the Act provides that "[e]ach State shall, not later than January 1, 2014, establish an American Health Benefit Exchange." ACA § 1311(b)(1). However, § 1321 of the Act clarifies that a state may "elect" to establish an Exchange. Section 1321(c) further provides that if a state does not "elect" to establish an Exchange by January 1, 2014, or fails to meet certain federal requirements for the Exchanges, "the Secretary [of HHS] shall . . . establish and operate such exchange within the State . . . ." ACA § 1321(c)(1). Only sixteen states plus the District of Columbia have elected to set up their own Exchanges; the remaining thirty-four states rely on federally-facilitated Exchanges.

Eligibility for the premium tax credits is calculated according to 26 U.S.C. § 36B. This section defines the annual

6

"premium assistance credit amount" as the sum of the monthly premium assistance amounts for "all coverage months of the taxpayer occurring during the taxable year."  Id. § 36B(b)(1). A "coverage month" is one in which the taxpayer is enrolled in a health plan "through an Exchange established by the State under section 1311."  Id. § 36B(c)(2)(A)(i); see also id. § 36B(b)(2)(A)-(B) (calculating the premium assistance amount in relation to the price of premiums available and enrolled in "through an Exchange established by the State under [§] 1311").

In addition to the tax credits, the Act requires most Americans to obtain "minimum essential" coverage or pay a tax penalty imposed by the IRS.  Id. § 5000A; NFIB, 132 S. Ct. at 2580.  However, the Act includes an unaffordability exemption that excuses low-income individuals for whom the annual cost of health coverage exceeds eight percent of their projected household income.  26 U.S.C. § 5000A(e)(1)(A).  The cost of coverage is calculated as the annual premium for the least expensive insurance plan available on an Exchange offered in a consumer's state, minus the tax credit described above.  Id. § 5000A(e)(1)(B)(ii).  The tax credits thereby reduce the number of individuals exempt from the minimum coverage requirement, and in turn increase the number of individuals who must either purchase health insurance coverage, albeit at a discounted rate, or pay a penalty.

7

The IRS has promulgated regulations making the premium tax credits available to qualifying individuals who purchase health insurance on both state-run and federally-facilitated Exchanges. See 26 C.F.R. § 1.36B-1(k); Health Insurance Premium Tax Credit, 77 Fed. Reg. 30,377, 30,378 (May 23, 2012) (collectively the "IRS Rule"). The IRS Rule provides that the credits shall be available to anyone "enrolled in one or more qualified health plans through an Exchange," and then adopts by cross-reference an HHS definition of "Exchange" that includes any Exchange, "regardless of whether the Exchange is established and operated by a State . . . or by HHS." 26 C.F.R. § 1.36B-2; 45 C.F.R. § 155.20. Individuals who purchase insurance through federally-facilitated Exchanges are thus eligible for the premium tax credits under the IRS Rule. In response to commentary that this interpretation might conflict with the text of the statute, the IRS issued the following explanation:

> The statutory language of section 36B and other provisions of the Affordable Care Act support the interpretation that credits are available to taxpayers who obtain coverage through a State Exchange, regional Exchange, subsidiary Exchange, and the Federally-facilitated Exchange. Moreover, the relevant legislative history does not demonstrate that Congress intended to limit the premium tax credit to State Exchanges. Accordingly, the final regulations maintain the rule in the proposed regulations because it is consistent with the language, purpose, and structure of section 36B and the Affordable Care Act as a whole.

77 Fed. Reg. at 30,378.

8

The plaintiffs in this case are Virginia residents who do not want to purchase comprehensive health insurance. Virginia has declined to establish a state-run Exchange and is therefore served by the prominent federally-facilitated Exchange known as HealthCare.gov. Without the premium tax credits, the plaintiffs would be exempt from the individual mandate under the unaffordability exemption. With the credits, however, the reduced costs of the policies available to the plaintiffs subject them to the minimum coverage penalty. According to the plaintiffs, then, as a result of the IRS Rule, they will incur some financial cost because they will be forced either to purchase insurance or pay the individual mandate penalty.

The plaintiffs' complaint alleges that the IRS Rule exceeds the agency's statutory authority, is arbitrary and capricious, and is contrary to law in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. The plaintiffs contend that the statutory language calculating the amount of premium tax credits according to the cost of the insurance policy that the taxpayer "enrolled in through an Exchange established by the State under [§ 1311]" precludes the IRS's interpretation that the credits are also available on national Exchanges. 26 U.S.C. § 36B(b)(2)(A), (c)(2)(A)(i) (emphasis added). The district court disagreed, finding that the statute as a whole clearly evinced Congress's intent to make the tax credits available

9

nationwide.  The district court granted the defendants' motion to dismiss, and the plaintiffs timely appealed.

## II.

We must first address whether the plaintiffs' claims are justiciable.  The defendants make two arguments on this point: (1) that the plaintiffs lack standing; and (2) that the availability of a tax-refund action acts as an independent bar to the plaintiffs' claims under the APA.

## A.

We review de novo the legal question of whether plaintiffs have standing to sue.  Wilson v. Dollar General Corp., 717 F.3d 337, 342 (4th Cir. 2013).  Article III standing requires a litigant to demonstrate "an invasion of a legally protected interest" that is "concrete and particularized" and "'actual or imminent.'"  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992) (quoting Whitmore v. Arkansas, 495 U.S. 149, 155 (1990)). The plaintiffs premise their standing on the claim that, if they were not eligible for the premium tax credits, they would qualify for the unaffordability exemption in 26 U.S.C. § 5000A and would therefore not be subject to the tax penalty for failing to maintain minimum essential coverage.  Thus, because of the credits, the plaintiffs argue that they face a direct

financial burden because they are forced either to purchase insurance or pay the penalty.

We agree that this represents a concrete economic injury that is directly traceable to the IRS Rule. The IRS Rule forces the plaintiffs to purchase a product they otherwise would not, at an expense to them, or to pay the tax penalty for failing to comply with the individual mandate, also subjecting them to some financial cost. Although it is counterintuitive, the tax credits, working in tandem with the Act's individual mandate, impose a financial burden on the plaintiffs.

The defendants' argument against standing is premised on the claim that the plaintiffs want to purchase "catastrophic" insurance coverage, which in some cases is more expensive than subsidized comprehensive coverage required by the Act. The defendants thus claim that the plaintiffs have acknowledged they would actually expend more money on a separate policy even if they were eligible for the credits. Regardless of the viability of this argument, it rests on an incorrect premise. The defendants misread the plaintiffs' complaint, which, while mentioning the possibility that several of the plaintiffs wish to purchase catastrophic coverage, also clearly alleges that each plaintiff does not want to buy comprehensive, ACA-compliant coverage and is harmed by having to do so or pay a penalty. The harm in this case is having to choose between ACA-compliant

11

coverage and the penalty, both of which represent a financial cost to the plaintiffs. That harm is actual or imminent, and is directly traceable to the IRS Rule. The plaintiffs thus have standing to present their claims.

**B.**

The defendants also argue that the availability of a tax-refund action bars the plaintiffs' claims under the APA. The defendants assert that the proper course of action for the plaintiffs is to pay the tax penalty and then present their legal arguments against the IRS Rule as part of a tax-refund action brought under either 26 U.S.C. § 7422(a) ("No suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected, . . . until a claim for refund or credit has been duly filed . . . ."), or the Little Tucker Act, 28 U.S.C. § 1346 (granting district courts jurisdiction to hear "[a]ny civil action against the United States for the recovery of any internal-revenue tax alleged to have been erroneously or illegally assessed or collected, or any penalty claimed to have been collected without authority or any sum alleged to have been excessive or in any manner wrongfully

12

collected under the internal-revenue laws").[1]  The defendants do not, nor could they, assert this as a jurisdictional bar, but instead point to "general equitable principles disfavoring the issuance of federal injunctions against taxes, absent clear proof that available remedies at law [are] inadequate."  Bob Jones Univ. v. Simon, 416 U.S. 725, 742 n.16 (1974).  The defendants argue that a tax refund action presents an "adequate remedy" that the plaintiffs must first pursue before challenging the IRS Rule directly under the APA.  See 5 U.S.C. § 704 ("Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review.").

The defendants' arguments are not persuasive.  First, they fail to point to a single case in which a court has refused to entertain a similar suit on the grounds that the parties were required to first pursue a tax-refund action under 26 U.S.C. § 7422(a) or 28 U.S.C. § 1346.  Moreover, the plaintiffs are not seeking a tax refund; they ask for no monetary relief, alleging instead claims for declaratory and injunctive relief in an attempt to forestall the lose-lose choice (in their minds) of

---

[1]  Although 26 U.S.C. § 7422(a) does not appear to specifically authorize suits, § 6532 speaks of refund suits filed "under § 7422(a)."  See also Cohen v. United States, 650 F.3d 717, 731, n.11 (D.C. Cir. 2011) (en banc).

purchasing a product they do not want or paying the penalty. Section 7422(a) does not allow for prospective relief. Instead, it bars suit "for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected." 26 U.S.C. 7422(a) (emphasis added); see also Cohen, 650 F.3d at 732 ("[Section 7422(a)] does not, at least explicitly, allow for prospective relief."). Similarly, "[t]he Little Tucker Act does not authorize claims that seek primarily equitable relief." Berman v. United States, 264 F.3d 16, 21 (1st Cir. 2001) (citing Richardson v. Morris, 409 U.S. 464, 465 (1973); Bobula v. United States Dep't of Justice, 970 F.2d 854, 858-59 (Fed. Cir. 1992)).

It is clear, then, that the alternative forms of relief suggested by the defendants would not afford the plaintiffs the complete relief they seek. This is simply not a typical tax refund action in which an individual taxpayer complains of the manner in which a tax was assessed or collected and seeks reimbursement for wrongly paid sums. The plaintiffs here challenge the legality of a final agency action, which is consistent with the APA's underlying purpose of "remov[ing] obstacles to judicial review of agency action." Bowen v. Massachusetts, 487 U.S. 879, 904 (1988). Requiring the plaintiffs to choose between purchasing insurance and thereby waiving their claims or paying the tax and challenging the IRS

14

Rule after the fact creates just such an obstacle.  We therefore find that the plaintiffs' suit is not barred under the APA.

## III.

Turning to the merits, "we review questions of statutory construction de novo."  Orquera v. Ashcroft, 357 F.3d 413, 418 (4th Cir. 2003).  Because this case concerns a challenge to an agency's construction of a statute, we apply the familiar two-step analytic framework set forth in Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984).  At Chevron's first step, a court looks to the "plain meaning" of the statute to determine if the regulation responds to it. Chevron, 467 U.S. at 842-43.  If it does, that is the end of the inquiry and the regulation stands.  Id.  However, if the statute is susceptible to multiple interpretations, the court then moves to Chevron's second step and defers to the agency's interpretation so long as it is based on a permissible construction of the statute.  Id. at 843.

### A.

At step one, "[i]f the statute is clear and unambiguous 'that is the end of the matter, for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'"  Bd. of Governors of the Fed. Reserve Sys. v. Dimension Fin. Corp., 474 U.S. 361, 368 (1986) (quoting Chevron,

15

467 U.S. at 842-43).  A statute is ambiguous only if the disputed language is "reasonably susceptible of different interpretations."  Nat'l R.R. Passenger Corp. v. Atchison Topeka & Santa Fe Ry. Co., 470 U.S. 451, 473 n.27 (1985).  "The objective of Chevron step one is not to interpret and apply the statute to resolve a claim, but to determine whether Congress's intent in enacting it was so clear as to foreclose any other interpretation."  Grapevine Imports, Ltd. v. United States, 636 F.3d 1367, 1377 (Fed. Cir. 2011).  Courts should employ all the traditional tools of statutory construction in determining whether Congress has clearly expressed its intent regarding the issue in question.  Chevron, 467 U.S. at 843 n.9; Nat'l Elec. Mfrs. Ass'n v. U.S. Dep't of Energy, 654 F.3d 496, 504 (4th Cir. 2011).

## 1.

In construing a statute's meaning, the court "begin[s], as always, with the language of the statute."  Duncan v. Walker, 533 U.S. 167, 172 (2001).  As described above, 26 U.S.C. § 36B provides that the premium assistance amount is the sum of the monthly premium assistance amounts for all "coverage months" for which the taxpayer is covered during a year.  A "coverage month" is one in which "the taxpayer . . . is covered by a qualified health plan . . . enrolled in through an Exchange established by the State under [§] 1311 of the [Act]."  26 U.S.C.

16

§ 36B(b)(2)(A). Similarly, the statute calculates an individual's tax credit by totaling the "premium assistance amounts" for all "coverage months" in a given year. Id. § 36B(b)(1). The "premium assistance amount" is based in part on the cost of the monthly premium for the health plan that the taxpayer purchased "through an Exchange established by the State under [§] 1311." Id. § 36B(b)(2).

The plaintiffs assert that the plain language of both relevant subsections in § 36B is determinative. They contend that in defining the terms "coverage months" and "premium assistance amount" by reference to Exchanges that are "established by the State under [§] 1311," Congress limited the availability of tax credits to individuals purchasing insurance on state Exchanges. Under the plaintiffs' construction, the premium credit amount for individuals purchasing insurance through a federal Exchange would always be zero.

The plaintiffs' primary rationale for their interpretation is that the language says what it says, and that it clearly mentions state-run Exchanges under § 1311. If Congress meant to include federally-run Exchanges, it would not have specifically chosen the word "state" or referenced § 1311. The federal government is not a "State," and so the phrase "Exchange established by the State under [§] 1311," standing alone, supports the notion that credits are unavailable to consumers on

17

federal Exchanges. Further, the plaintiffs assert that because state and federal Exchanges are referred to separately in § 1311 and § 1321, the omission in 26 U.S.C. § 36B of any reference to federal Exchanges established under § 1321 represents an intentional choice on behalf of Congress to exclude federal Exchanges and include only state Exchanges established under § 1311.

There can be no question that there is a certain sense to the plaintiffs' position. If Congress did in fact intend to make the tax credits available to consumers on both state and federal Exchanges, it would have been easy to write in broader language, as it did in other places in the statute. See 42 U.S.C. § 18032(d)(3)(D)(i)(II) (referencing Exchanges "established under this Act").

However, when conducting statutory analysis, "a reviewing court should not confine itself to examining a particular statutory provision in isolation. Rather, [t]he meaning – or ambiguity – of certain words or phrases may only become evident when placed in context." Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 666 (2007) (internal citation and quotation marks omitted). With this in mind, the defendants' primary counterargument points to ACA §§ 1311 and 1321, which, when read in tandem with 26 U.S.C. § 36B, provide an equally plausible understanding of the statute, and one that

18

comports with the IRS's interpretation that credits are available nationwide.

As noted, § 1311 provides that "[e]ach State shall, not later than January 1, 2014, establish an American Health Benefit Exchange (referred to in this title as an "Exchange")[.]" It goes on to say that "[a]n Exchange shall be a governmental agency or nonprofit entity that is established by a State," apparently narrowing the definition of "Exchange" to encompass only state-created Exchanges. ACA § 1311(d)(1). Similarly, the definitions section of the Act, § 1563(b), provides that "[t]he term 'Exchange' means an American Health Benefit Exchange established under [§] 1311," further supporting the notion that all Exchanges should be considered as if they were established by a State.

Of course, § 1311's directive that each State establish an Exchange cannot be understood literally in light of § 1321, which provides that a state may "elect" to do so. Section 1321(c) provides that if a state fails to establish an Exchange by January 1, 2014, the Secretary "shall . . . establish and operate <u>such Exchange</u> within the State and the Secretary shall take such actions as are necessary to implement such other requirements." (emphasis added). The defendants' position is that the term "such Exchange" refers to a state Exchange that is set up and operated by HHS. In other words, the statute

19

mandates the existence of state Exchanges, but directs HHS to establish such Exchanges when the states fail to do so themselves. In the absence of state action, the federal government is required to step in and create, by definition, "an American Health Benefit Exchange established under [§] 1311" on behalf of the state.

Having thus explained the parties' competing primary arguments, the court is of the opinion that the defendants have the stronger position, although only slightly. Given that Congress defined "Exchange" as an Exchange established by the state, it makes sense to read § 1321(c)'s directive that HHS establish "such Exchange" to mean that the federal government acts on behalf of the state when it establishes its own Exchange. However, the court cannot ignore the common-sense appeal of the plaintiffs' argument; a literal reading of the statute undoubtedly accords more closely with their position. As such, based solely on the language and context of the most relevant statutory provisions, the court cannot say that Congress's intent is so clear and unambiguous that it "foreclose[s] any other interpretation." Grapevine Imports, 636 F.3d at 1377.

**2.**

We next examine two other, less directly relevant provisions of the Act to see if they shed any more light on

20

Congress's intent. Food and Drug Admin. v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 132-33 (2000) ("A court must . . . interpret the statute as a symmetrical and coherent regulatory scheme, and fit, if possible, all parts into a harmonious whole.") (citation and internal quotation marks omitted). First, the defendants argue that reporting provisions in § 36B(f) conflict with the plaintiffs' interpretation and confirm that the premium tax credits must be available on federally-run Exchanges. Section 36B(f) – titled "Reconciliation of credit and advance credit" – requires the IRS to reduce the amount of a taxpayer's end-of-year premium tax credit by the amount of any advance payment of such credit. See 26 U.S.C. § 36B(f)(1) ("The amount of the credit allowed under this section for any taxable year shall be reduced (but not below zero) by the amount of any advance payment of such credit[.]"). To enable the IRS to track these advance payments, the statute requires "[e]ach Exchange (or any person carrying out 1 or more responsibilities of an Exchange under section 1311(f)(3) or 1321(c) of the [Act])" to provide certain information to the Department of the Treasury. Id. § 36B(f)(3) (emphasis added). There is no dispute that the reporting requirements apply regardless of whether an Exchange was established by a state or HHS. The Exchanges are required to report the following information:

21

(A)    The level of coverage described in section 1302(d) of the Patient Protection and Affordable Care Act and the period such coverage was in effect.

(B)    The total premium for the coverage without regard to the credit under this section or cost-sharing reductions under section 1402 of such Act.

(C)    The aggregate amount of any advance payment of such credit or reductions under section 1412 of such Act.

(D)    The name, address, and TIN of the primary insured and the name and TIN of each other individual obtaining coverage under the policy.

(E)    Any information provided to the Exchange, including any change of circumstances, necessary to determine eligibility for, and the amount of, such credit.

(F)    Information necessary to determine whether a taxpayer has received excess advance payments.

Id.

The defendants argue, sensibly, that if premium tax credits were not available on federally-run Exchanges, there would be no reason to require such Exchanges to report the information found in subsections (C), (E), and (F). It is therefore possible to infer from the reporting requirements that Congress intended the tax credits to be available on both state- and federally-facilitated Exchanges. The plaintiffs acknowledge that some of the reporting requirements are extraneous for federally-run Exchanges, but note that the other categories of reportable information, i.e., subsections (A), (B), and (D), remain relevant even in the absence of credits. The plaintiffs suggest

22

that Congress was simply saving itself the trouble of writing two separate subsections, one for each type of Exchange, by including a single comprehensive list.

The second source of potentially irreconcilable language offered by the defendants concerns the "qualified individuals" provision under ACA § 1312. That section sets forth provisions regarding which individuals may purchase insurance from the Exchanges. It provides that only "qualified individuals" may purchase health plans in the individual markets offered through the Exchanges, and explains that a "qualified individual" is a person who "resides in the State that established the Exchange." ACA § 1312. The defendants argue that unless their reading of § 1321 is adopted and understood to mean that the federal government stands in the shoes of the state for purposes of establishing an Exchange, there would be no "qualified individuals" existing in the thirty-four states with federally-facilitated Exchanges because none of those states is a "State that established the Exchange." This would leave the federal Exchanges with no eligible customers, a result Congress could not possibly have intended.

The plaintiffs acknowledge that this would be untenable, and suggest that the residency requirement is only applicable to state-created Exchanges. They note that § 1312 states that a "qualified individual" – "with respect to an Exchange" – is one

who "resides in the State that established the Exchange." ACA § 1312(f)(1)(A) (emphasis added). Accordingly, because "Exchange" is defined as an Exchange established under § 1311, i.e., the provision directing states to establish Exchanges, the residency requirement only limits enrollment on state Exchanges.

Having considered the parties' competing arguments on both of the above-referenced sections, we remain unpersuaded by either side. Again, while we think the defendants make the better of the two cases, we are not convinced that either of the purported statutory conflicts render Congress's intent clear. Both parties offer reasonable arguments and counterarguments that make discerning Congress's intent difficult. Additionally, we note that the Supreme Court has recently reiterated the admonition that courts avoid revising ambiguously drafted legislation out of an effort to avoid "apparent anomal[ies]" within a statute. Michigan v. Bay Mills Indian Cmty., No. 12-515, 572 U.S. ___, ___, slip op. at 10 (May 27, 2014). It is not especially surprising that in a bill of this size – "10 titles stretch[ing] over 900 pages and contain[ing] hundreds of provisions," NFIB, 132 S. Ct. at 2580, – there would be one or more conflicting provisions. See Bay Mills, at 10-11 ("Truth be told, such anomalies often arise from statutes, if for no other reason than that Congress typically legislates by parts . . . ."). Wary of granting excessive analytical weight to

24

relatively minor conflicts within a statute of this size, we decline to accept the defendants' arguments as dispositive of Congress's intent.

**3.**

The Act's legislative history is also not particularly illuminating on the issue of tax credits. See Philip Morris USA, Inc. v. Vilsack, 736 F.3d 284, 289 (4th Cir. 2013) (considering legislative history at Chevron step one). But see Nat'l Elec. Mfrs. Ass'n, 654 F.3d at 505 (noting that, "in consulting legislative history at step one of Chevron, we have utilized such history only for limited purposes, and only after exhausting more reliable tools of construction"). As both parties concede, the legislative history of the Act is somewhat lacking, particularly for a bill of this size.[2] Several floor statements from Senators support the notion that it was well understood that tax credits would be available for low- and middle-income Americans nationwide. For example, Senator Baucus stated that the "tax credits will help to ensure all Americans

---

[2] As another court considering a similar challenge to the IRS Rule recently noted, "[b]ecause the House and Senate versions of the Act were synthesized through a reconciliation process, rather than the standard conference committee process, no conference report was issued for the Act, and there is a limited legislative record relating to the final version of the bill." Halbig v. Sebelius, No. 13-623, 2014 WL 129023, at *17 n.13 (D.D.C. Jan. 15, 2014).

can afford quality health insurance." 155 Cong. Rec. S11,964 (Nov. 21, 2009). He later estimated that "60 percent of those who are getting insurance in the individual market on the exchange will get tax credits . . . ." 155 Cong. Rec. S12,764 (Dec. 9, 2009). Similarly, Senator Durbin stated that half of the "30 million Americans today who have no health insurance . . . will qualify for . . . tax credits to help them pay their premiums so they can have and afford health insurance." 155 Cong. Rec. S13,559 (Dec. 20, 2009). These figures only make sense if all financially eligible Americans are understood to have access to the credits.

However, it is possible that such statements were made under the assumption that every state would in fact establish its own Exchange. As the district court stated, "Congress did not expect the states to turn down federal funds and fail to create and run their own Exchanges." King v. Sebelius, No. 3:13-cv-630, 2014 WL 637365, at *14 (E.D. Va. Feb. 18, 2014). The Senators' statements therefore do not necessarily address the question of whether the credits would remain available in the absence of state-created Exchanges. The plaintiffs argue extensively that Congress could not have anticipated that so few states would establish their own Exchanges. Indeed, they argue that Congress attempted to "coerce" the states into establishing Exchanges by conditioning the availability of the credits on the

26

presence of state Exchanges. The plaintiffs contend that Congress struck an internal bargain in which it decided to favor state-run Exchanges by incentivizing their creation with billions of dollars of tax credits. According to the plaintiffs, however, Congress's plan backfired when a majority of states refused to establish their own Exchanges, in spite of the incentives. The plaintiffs thus acknowledge that the lack of widely available tax credits is counter to Congress's original intentions, but consider this the product of a Congressional miscalculation that the courts have no business correcting.

Although the plaintiffs offer no compelling support in the legislative record for their argument,[3] it is at least plausible that Congress would have wanted to ensure state involvement in the creation and operation of the Exchanges. Such an approach would certainly comport with a literal reading of 26 U.S.C. § 36B's text. In any event, it is certainly possible that the Senators quoted above were speaking under the assumption that

---

[3] The plaintiffs take an isolated, stray comment from Senator Baucus during a Senate Finance Committee hearing well out of context, see J.A. 285-87, and similarly place too much emphasis on a draft bill from the Senate Health, Education, Labor, and Pensions Committee that would have conditioned subsidies for a state's residents on the state's adoption of certain "insurance reform provisions," see S. 1679, § 3104(a), (d)(2), 111th Cong. (2009).

each state would establish its own Exchange, and that they could not have envisioned the issue currently being litigated. Although Congress included a fallback provision in the event the states failed to act, it is not clear from the legislative record how large a role Congress expected the federal Exchanges to play in administering the Act. We are thus of the opinion that nothing in the legislative history of the Act provides compelling support for either side's position.

Having examined the plain language and context of the most relevant statutory sections, the context and structure of related provisions, and the legislative history of the Act, we are unable to say definitively that Congress limited the premium tax credits to individuals living in states with state-run Exchanges. We note again that, on the whole, the defendants have the better of the statutory construction arguments, but that they fail to carry the day. Simply put, the statute is ambiguous and subject to at least two different interpretations. As a result, we are unable to resolve the case in either party's favor at the first step of the Chevron analysis.

**B.**

Finding that Congress has not "directly spoken to the precise question at issue," we move to Chevron's second step. 467 U.S. at 842. At step two, we ask whether the "agency's [action] is based on a permissible construction of the statute."

28

*Id.* at 843. We "will not usurp an agency's interpretive authority by supplanting its construction with our own, so long as the interpretation is not 'arbitrary, capricious, or manifestly contrary to the statute.' A construction meets this standard if it 'represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute.'" Philip Morris, 736 F.3d at 290 (quoting Chevron, 467 U.S. at 844, 845). We have been clear that "[r]eview under this standard is highly deferential, with a presumption in favor of finding the agency action valid." Ohio Vall. Envt'l Coalition v. Aracoma Coal Co., 556 F.3d 177, 192 (4th Cir. 2009).

As explained, we cannot discern whether Congress intended one way or another to make the tax credits available on HHS-facilitated Exchanges. The relevant statutory sections appear to conflict with one another, yielding different possible interpretations. In light of this uncertainty, this is a suitable case in which to apply the principles of deference called for by Chevron. See Scialabba v. Cuellar de Osorio, No. 12-930, 573 U.S. ___, ___, slip op. at 14 (June 9, 2014) ("[I]nternal tension [in a statute] makes possible alternative reasonable constructions, bringing into correspondence in one way or another the section's different parts. And when that is so, Chevron dictates that a court defer to the agency's choice

29

. . . .") (plurality opinion); <u>Nat'l Elec. Mfrs. Ass'n</u>, 654 F.3d at 505 ("[W]e have reached <u>Chevron</u>'s second step after describing statutory language as 'susceptible to more precise definition and open to varying constructions.'") (quoting <u>Md. Dep't of Health and Mental Hygiene v. Centers for Medicare and Medicaid Servs.</u>, 542 F.3d 424, 434 (4th Cir. 2008)).[4]

What we must decide is whether the statute permits the IRS to decide whether the tax credits would be available on federal Exchanges. In answering this question in the affirmative we are primarily persuaded by the IRS Rule's advancement of the broad

---

[4] We recognize that not every ambiguity in a statute gives rise to <u>Chevron</u> deference. Often, but not always, courts will yield to an agency's interpretation only when the ambiguity creates some discretionary authority for the agency to fulfill. <u>See</u> <u>Chamber of Commerce of U.S. v. N.L.R.B.</u>, 721 F.3d 152, 161 (4th Cir. 2013) ("'Mere ambiguity in a statute is not evidence of congressional delegation of authority.' Rather, '[t]he ambiguity must be such as to make it appear that Congress either explicitly or implicitly delegated authority to cure that ambiguity.'") (quoting <u>Am. Bar Ass'n v. F.T.C.</u>, 430 F.3d 457, 469 (D.C. Cir. 2005)) (alteration in original). However, given the importance of the tax credits to the overall statutory scheme, it is reasonable to assume that Congress created the ambiguity in this case with at least some degree of intentionality. <u>See</u> <u>City of Arlington v. F.C.C.</u>, 133 S. Ct. 1863, 1868 (2013) ("Congress knows to speak in plain terms when it wishes to circumscribe, and in capacious terms when it wishes to enlarge, agency discretion."). There are several possible reasons for leaving an ambiguity of this sort: Congress perhaps might not have wanted to resolve a politically sensitive issue; additionally, it might have intended to see how large a role the states were willing to adopt on their own before having the agency respond with rules that could best effectuate the purpose of the Act in light of the actual circumstances present several years after the bill's passage.

policy goals of the Act. See Vill. of Barrington v. Surface Transp. Bd., 636 F.3d 650, 666 (D.C. Cir. 2011) ("[W]hen an agency interprets ambiguities in its organic statute, it is entirely appropriate for that agency to consider . . . policy arguments that are rationally related to the [statute's] goals." (internal quotation marks and citation omitted)); Ariz. Pub. Serv. Co. v. EPA, 211 F.3d 1280, 1287 (D.C. Cir. 2000) ("[A]s long as the agency stays within [Congress's] delegation, it is free to make policy choices in interpreting the statute, and such interpretations are entitled to deference.") (quotation marks omitted). There is no question that the Act was intended as a major overhaul of the nation's entire health insurance market. The Supreme Court has recognized the broad policy goals of the Act: "to increase the number of Americans covered by health insurance and decrease the cost of health care." NFIB, 132 S. Ct. at 2580. Similarly, Title I of the ACA is titled "Quality, Affordable Health Care for All Americans" (emphasis added).

Several provisions of the Act are necessary to achieving these goals. To begin with, the individual mandate requires nearly all Americans to have health insurance or pay a fine. Increasing the pool of insured individuals has the intended side-effect of increasing revenue for insurance providers. The increased revenue, in turn, supports several more specific

policy goals contained in the Act. The most prominent of these are the guaranteed-issue and community-rating provisions. In short, these provisions bar insurers from denying coverage or charging higher premiums because of an individual's health status. See ACA § 1201. However, these requirements, standing alone, would result in an "adverse selection" scenario whereby individuals disproportionately likely to utilize health care would drive up the costs of policies available on the Exchanges.

Congress understood that one way to avoid such price increases was to require near-universal participation in the insurance marketplace via the individual mandate. In combination with the individual mandate, Congress authorized broad incentives - totaling hundreds of billions of dollars – to further increase market participation among low- and middle-income individuals. A Congressional Budget Office report issued while the Act was under consideration informed Congress that there would be an "an influx of enrollees with below-average spending for health care, who would purchase coverage because of the new subsidies to be provided and the individual mandate to be imposed." J.A. 95. The report further advised Congress that "[t]he substantial premium subsidies available in the exchanges would encourage the enrollment of a broad range of people"; and that the structure of the premium tax credits, under which federal subsidies increase if premiums rise, "would dampen the

32

chances that a cycle of rising premiums and declining enrollment would ensue." J.A. 108-109. As the defendants further explain, denying tax credits to individuals shopping on federal Exchanges would throw a debilitating wrench into the Act's internal economic machinery:

> Insurers in States with federally-run Exchanges would still be required to comply with guaranteed-issue and community-rating rules, but, without premium tax subsidies to encourage broad participation, insurers would be deprived of the broad policy-holder base required to make those reforms viable. Adverse selection would cause premiums to rise, further discouraging market participation, and the ultimate result would be an adverse-selection "death spiral" in the individual insurance markets in States with federally-run Exchanges.

Br. of Appellees, at 35; see also Amicus Br. of America's Health Insurance Plans, at 3-6; Amicus Br. for Economic Scholars, at 3-6.[5]

It is therefore clear that widely available tax credits are essential to fulfilling the Act's primary goals and that Congress was aware of their importance when drafting the bill. The IRS Rule advances this understanding by ensuring that this

---

[5] Likewise, four Supreme Court Justices have remarked on the importance of the tax credit system: "Without the federal subsidies, individuals would lose the main incentive to purchase insurance inside the exchanges, and some insurers may be unwilling to offer insurance inside of exchanges. With fewer buyers and even fewer sellers, the exchanges would not operate as Congress intended and may not operate at all." NFIB, 132 S. Ct. at 2674 (Scalia, Kennedy, Thomas, and Alito, JJ., dissenting).

33

essential component exists on a sufficiently large scale. The IRS Rule became all the more important once a significant number of states indicated their intent to forgo establishing Exchanges. With only sixteen state-run Exchanges currently in place, the economic framework supporting the Act would crumble if the credits were unavailable on federal Exchanges. Furthermore, without an exception to the individual mandate, millions more Americans unable to purchase insurance without the credits would be forced to pay a penalty that Congress never envisioned imposing on them. The IRS Rule avoids both these unforeseen and undesirable consequences and thereby advances the true purpose and means of the Act.

It is thus entirely sensible that the IRS would enact the regulations it did, making <u>Chevron</u> deference appropriate. Confronted with the Act's ambiguity, the IRS crafted a rule ensuring the credits' broad availability and furthering the goals of the law. In the face of this permissible construction, we must defer to the IRS Rule. <u>See</u> <u>Scialabba</u>, at 33 ("Whatever Congress might have meant in enacting [the statute], it failed to speak clearly. Confronted with a self-contradictory, ambiguous provision in a complex statutory scheme, the Board chose a textually reasonable construction consonant with its view of the purposes and policies underlying immigration law. Were we to overturn the Board in that circumstance, we would

assume as our own the responsible and expert agency's role."); Nat'l Elec. Mfrs. Ass'n, 654 F.3d at 505 ("[W]e defer at [Chevron's] step two to the agency's interpretation so long as the construction is a reasonable policy choice for the agency to make.") (second alteration in original).

Tellingly, the plaintiffs do not dispute that the premium tax credits are an essential component of the Act's viability. Instead, as explained above, they concede that Congress probably wanted to make subsidies available throughout the country, but argue that Congress was equally concerned with ensuring that the states play a leading role in administering the Act, and thus conditioned the availability of the credits on the creation of state Exchanges. The plaintiffs argue that the IRS Rule exceeds the agency's authority because it irreconcilably conflicts with Congress's goal of ensuring state leadership. For the reasons explained above, however, we are not persuaded by the plaintiffs' "coercion" argument and do not consider it a valid basis for circumscribing the agency's authority to implement the Act in an efficacious manner.

The plaintiffs also attempt to avert Chevron deference by arguing that ACA §§ 1311 and 1321 are administered by HHS and not the IRS, and that as a result the IRS had no authority to enact its final rule. However, the relevant statutory language is found in 26 U.S.C. § 36B, which is part of the Internal

35

Revenue Code and subject to interpretation by the IRS.  See 77 Fed. Reg. at 30,378 (describing the IRS Rule as a valid interpretation of 26 U.S.C. § 36B).  Although the IRS Rule adopts by cross-reference an HHS definition of "Exchange," 26 C.F.R. § 1.36B-1(k), the Act clearly gives to the IRS authority to resolve ambiguities in 26 U.S.C. § 38B ("The Secretary shall prescribe such regulations as may be necessary to carry out the provisions of this section").  This clear delegation of authority to the IRS relieves us of any possible doubt regarding the propriety of relying on one agency's interpretation of a single piece of a jointly-administered statute.

Finally, the plaintiffs contend that a rule of statutory construction that requires tax exemptions and credits to be construed narrowly displaces Chevron deference in this case. However, while the Supreme Court has stated that tax credits "must be expressed in clear and unambiguous terms," Yazoo & Miss. Valley R.R. Co. v. Thomas, 132 U.S. 174, 183 (1889), the Supreme Court has never suggested that this principle displaces Chevron deference, and in fact has made it quite clear that it does not.  See Mayo Found. for Medical Educ. and Research v. United States, 131 S. Ct. 704, 713 (2011) ("[T]he principles underlying our decision in Chevron apply with full force in the tax context."); see also id. at 712 (collecting cases in which

36

the Supreme Court has applied <u>Chevron</u> deference interpreting IRS regulations).

Rejecting all of the plaintiffs' arguments as to why <u>Chevron</u> deference is inappropriate in this case, for the reasons explained above we are satisfied that the IRS Rule is a permissible construction of the statutory language. We must therefore apply <u>Chevron</u> deference and uphold the IRS Rule.[6]

Accordingly, the judgment of the district court is affirmed.

<u>AFFIRMED</u>

---

[6] The Commonwealth of Virginia, acting as amicus on behalf of the defendants, argues that the plaintiffs' construction of the statute violates the Constitution's Spending Clause by failing to provide Virginia with "clear notice" that receipt of billions of dollars in tax credits for its low- and middle-income citizens was contingent on establishing an Exchange. The Commonwealth's argument derives from <u>Pennhurst State School & Hospital v. Halderman</u>, in which the Supreme Court stated that "if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously. By insisting that Congress speak with a clear voice, we enable the States to exercise their choice knowingly, cognizant of the consequences of their participation." 451 U.S. 1, 17 (1981) (internal citations omitted). Although ably advanced, we have no reason to reach the Commonwealth's constitutional argument because we find the IRS Rule to be an appropriate exercise of the agency's authority under <u>Chevron</u>. <u>See</u> <u>Norfolk S. Ry. Co. v. City of Alexandria</u>, 608 F.3d 150, 157 (4th Cir. 2010) ("The principle of constitutional avoidance . . . requires the federal courts to avoid rendering constitutional rulings unless absolutely necessary.") (citing <u>Ashwander v. Tenn. Valley Auth.</u>, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring)).

DAVIS, Senior Circuit Judge, concurring:

I am pleased to join in full the majority's holding that the Patient Protection and Affordable Care Act (the Act) "permits" the Internal Revenue Service to decide whether premium tax credits should be available to consumers who purchase health insurance coverage on federally-run Exchanges. Maj. Op. at 30. But I am also persuaded that, even if one takes the view that the Act is not ambiguous in the manner and for the reasons described, the necessary outcome of this case is precisely the same. That is, I would hold that Congress has mandated in the Act that the IRS provide tax credits to all consumers regardless of whether the Exchange on which they purchased their health insurance coverage is a creature of the state or the federal bureaucracy. Accordingly, at <u>Chevron</u> Step One, the IRS Rule making the tax credits available to all consumers of Exchange-purchased health insurance coverage, 26 C.F.R. § 1.36B-1(k), 77 Fed. Reg. 30,377, 30,378 (May 23, 2012), is the correct interpretation of the Act and is required as a matter of law. <u>Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.</u>, 467 U.S. 837, 842–43 (1984).

Although the Act expressly contemplates state-run Exchanges, ACA § 1311(b)(1), Congress created a contingency provision that permits the federal government, via the Secretary of Health and Human Services, to "establish and operate such

38

Exchange within the State and . . . take such actions as are necessary to implement such other requirements." Id. § 1321(c)(1). This contingency provision is triggered when a state elects not to set up an Exchange, when a state is delayed in setting up an Exchange, or when a state Exchange fails to meet certain statutory and regulatory requirements. Id. § 1321(c)(1).

Enter the premium tax credits, essentially a tax subsidy for the purchase of health insurance. The amended tax code, 26 U.S.C. § 36B(b), sets forth the formula for calculating the amount of a consumer's premium tax credit. In general, the credit is equal to the lesser of two amounts: the monthly premium for a qualified health plan "enrolled in through an Exchange established by the State," or the excess of the adjusted monthly premium for a certain type of health plan over a percentage of the taxpayer's household income. Id. § 36B(b)(2).

Appellants contend that the language "enrolled in through an Exchange established by the State" precludes the IRS from providing premium tax credits to consumers who purchase health insurance coverage on federal Exchanges. To them, "established by the State" in the premium tax credits calculation subprovision is the sine qua non of this case. An Exchange established by the State is not an Exchange established by the federal government, they argue; thus, the equation for

39

calculating the amount of the premium tax credit is wholly inapplicable to all consumers who purchase health insurance coverage on federally-run Exchanges (the amount would be zero, according to Appellants).

I am not persuaded and for a simple reason: "[E]stablished by the State" indeed means established by the state - except when it does not, i.e., except when a state has failed to establish an Exchange and when the Secretary, charged with acting pursuant to a contingency for which Congress planned, id. § 1321(c), establishes and operates the Exchange in place of the state. When a state elects not to establish an Exchange, the contingency provision authorizes federal officials to establish and operate "such Exchange" and to take any action adjunct to doing so.

That disposes of the Appellants' contention. This is not a case that calls up the decades-long clashes between textualists, purposivists, and other schools of statutory interpretation. See Abbe Gluck, The States As Laboratories of Statutory Interpretation: Methodological Consensus and the New Modified Textualism, 119 Yale L.J. 1750, 1762-63 (2010). The case can be resolved through a contextual reading of a few different subsections of the statute. If there were any remaining doubt over this construction, the bill's structure dispels it: The contingency provision at § 1321(c)(1) is set forth in "Part III"

of the bill, titled "State Flexibility Relating to Exchanges," a section that appears <u>after</u> the section that creates the Exchanges and mandates that they be operated by state governments, ACA § 1311(b). What's more, the contingency provision does not create two-tiers of Exchanges; there is no indication that Congress intended the federally-operated Exchanges to be lesser Exchanges and for consumers who utilize them to be less entitled to important benefits. Thus, I conclude that a holistic reading of the Act's text and proper attention to its structure lead to only one sensible conclusion: The premium tax credits must be available to consumers who purchase health insurance coverage through their designated Exchange regardless of whether the Exchange is state- or federally-operated.

The majority opinion understandably engages with the Appellants and respectfully posits they could be perceived to advance a plausible construction of the Act, i.e., that Congress may have sought to restrict the scope of the contingency provision when it used the phrase "established by the State" in the premium tax credits calculation subprovision. But as the majority opinion deftly illustrates, a straightforward reading of the Act strips away any and all possible explanations for why Congress would have intended to exclude consumers who purchase health insurance coverage on federally-run Exchanges from

41

qualifying for premium tax credits. (The best Appellants can come up with seems to be some non-existent Congressional desire for "state leadership" (whatever that means) in effecting a comprehensive overhaul of the nation's health insurance marketplaces and related health care markets.) Such a reading, the majority opinion persuasively explains, is not supported by the legislative history or by the overall structure of the Act. Maj. Op. at 27, 24. Moreover, the majority carefully and cogently explains how "widely available tax credits are essential to fulfilling the Act's primary goals and [how] Congress was aware of their importance when drafting the bill." Maj. Op. at 33. Thus, the majority correctly holds that Congress did not intend a reading that has no legislative history to support it and runs contrary to the Act's text, structure, and goals. Appellants' "literal reading" of the premium tax credits calculation subprovision renders the entire Congressional scheme nonsensical. <u>Cf.</u> Maj. Op. at 27.

In fact, Appellants' reading is not literal; it's cramped. No case stands for the proposition that literal readings should take place in a vacuum, acontextually, and untethered from other parts of the operative text; indeed, the case law indicates the opposite. <u>National Association of Home Builders v. Defenders of Wildlife</u>, 551 U.S. 644, 666 (2007). So does common sense: If I ask for pizza from Pizza Hut for lunch but clarify that I would

be fine with a pizza from Domino's, and I then specify that I want ham and pepperoni on my pizza from Pizza Hut, my friend who returns from Domino's with a ham and pepperoni pizza has still complied with a literal construction of my lunch order. That is this case: Congress specified that Exchanges should be established and run by the states, but the contingency provision permits federal officials to act in place of the state when it fails to establish an Exchange. The premium tax credit calculation subprovision later specifies certain conditions regarding state-run Exchanges, but that does not mean that a literal reading of that provision somehow precludes its applicability to substitute federally-run Exchanges or erases the contingency provision out of the statute.

That Congress sometimes specified state <u>and</u> federal Exchanges in the bill is as unremarkable as it is unrevealing. This was, after all, a 900-page bill that purported to restructure the means of providing health care in this country. Neither the canons of construction nor any empirical analysis suggests that congressional drafting is a perfectly harmonious, symmetrical, and elegant endeavor. <u>See</u> <u>generally</u> Abbe Gluck & Lisa Schultz Bressman, Statutory Interpretation from the Inside: An Empirical Study of Congressional Drafting, Delegation, and the Canons: Part I, 65 Stan. L. Rev. 901 (2013). Sausage-makers are indeed offended when their craft is linked to legislating.

43

Robert Pear, If Only Laws Were Like Sausages, N.Y. Times, Dec. 5, 2010, at WK3. At worst, the drafters' perceived inconsistencies (if that is what they are at all) are far less probative of Congress' intent than the unqualified and broad contingency provision.

Appellants insist that the use of "established by the State" in the premium tax credits calculation subprovision is evidence of Congress' intent to limit the availability of tax credits to consumers of state Exchange-purchased health insurance coverage. Their reading bespeaks a deeply flawed effort to squeeze the proverbial elephant into the proverbial mousehole. Whitman v. American Trucking Associations, 531 U.S. 457, 468 (2001). If Congress wanted to create a two-tiered Exchange system, it would have done so expressly in the section of the Act that authorizes the creation of contingent, federally-run Exchanges. If Congress wanted to limit the availability of premium tax credits to consumers who purchase health coverage on state-run Exchanges, it would have said so rather than tinkering with the formula in a subprovision governing how to calculate the amount of the credit.

The real danger in the Appellants' proposed interpretation of the Act is that it misses the forest for the trees by eliding Congress' central purpose in enacting the Act: to radically restructure the American health care market with "the most

44

expansive social legislation enacted in decades." Sheryl Gay Stolberg & Robert Pear, Obama Signs Health Care Overhaul Into Law, With a Flourish, N.Y. Times, March 24, 2010, at A19. The widespread availability of premium tax credits was intended as a critical part of the bill, a point the President highlighted at the bill signing. Transcript of Remarks by the President and Vice President at Signing of the Health Insurance Reform Bill, March 23, 2010 ("And when this exchange is up and running, millions of people will get tax breaks to help them afford coverage, which represents the largest middle-class tax cut for health care in history. That's what this reform is about."). Appellants' approach would effectively destroy the statute by promulgating a new rule that makes premium tax credits unavailable to consumers who purchased health coverage on federal Exchanges. But of course, as their counsel largely conceded at oral argument, that is their not so transparent purpose.

Appellants, citizens of the Commonwealth of Virginia, do not wish to buy health insurance. Most assuredly, they have the right, but not the unfettered right, Nat'l Fed'n of Indep. Bus. v. Sebelius, 132 S. Ct. 2566 (2012), to decline to do so. They have a clear choice, one afforded by the admittedly less-than-perfect representative process ordained by our constitutional structure: they can either pay the relatively minimal amounts

45

needed to obtain health care insurance as provided by the Act, or they can refuse to pay and run the risk of incurring a tiny tax penalty. Id. What they may not do is rely on our help to deny to millions of Americans desperately-needed health insurance through a tortured, nonsensical construction of a federal statute whose manifest purpose, as revealed by the wholeness and coherence of its text and structure, could not be more clear.

As elaborated in this separate opinion, I am pleased to concur in full in Judge Gregory's carefully reasoned opinion for the panel.